IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PETER ANTHONY DAVIS,
        Petitioner,

vs.                                        Case No.  3:10cv385/MCR/CJK

SEC'Y, FLA. DEP'T OF CORR.,
        Respondent.
_____

## REPORT AND RECOMMENDATION

Before the Court is a petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 1) and supporting memorandum (doc. 2).  Respondent filed an answer (doc. 20), submitting relevant portions of the state court record (docs. 21-27). Petitioner filed a reply (doc. 33).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the pleadings and attachments before the Court show that petitioner is not entitled to federal habeas relief, and that the petition should be denied.

BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural history of this case are established by the state court record. (*See* Docs. 21-27).[1] Petitioner was indicted in the Circuit Court for Walton County, Florida, Case No. 1999-CF-141, on one count of first degree premeditated murder of his estranged wife. (Ex. A at 9). Petitioner was found guilty as charged following a jury trial. (Ex. F at 990, Exs. G, H, I). On May 14, 2001, petitioner was sentenced to life imprisonment. (Ex. F at 992-94).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D01-1945. (Ex. J). The First DCA affirmed the judgment per curiam without written opinion on October 7, 2002. *Davis v. State*, 829 So. 2d 206 (Fla. 1st DCA 2002) (Table) (copy at Ex. M). The mandate issued October 23, 2002. (Ex. N). The United States Supreme Court denied petitioner's certiorari petition on April 7, 2003. (Ex. R).

On July 3, 2003, petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D03-2844, alleging ineffective assistance of appellate counsel. (Ex. T). The First DCA denied the petition on July 30, 2003. *Davis v. State*, 855 So. 2d 59 (Fla. 1st DCA 2003) (Table) (copy at Ex. V). Petitioner's motion for rehearing (Ex. W) was denied on October 1, 2003. (Ex. X).

On October 7, 2003, petitioner filed a motion to correct sentence under Rule 3.800(a) of the Florida Rules of Criminal Procedure. (Ex. Y at 8-65). The state circuit court summarily denied the motion on November 3, 2003. (*Id.* at 76-110). Petitioner appealed the decision to the First DCA, Case No. 1D04-0670. (Ex. Z).

---

[1]Hereinafter, all references to exhibits are to those provided with respondent's answer (docs. 21–27), unless noted otherwise. If a cited page has more than one page number, the Court cites to the "Bates stamp" page number.

The First DCA affirmed the decision per curiam without written opinion on June 23, 2004. *Davis v. State*, 879 So. 2d 627 (Fla. 1st DCA 2004) (Table) (copy at Ex. BB). The mandate issued August 30, 2004. (Ex. EE).

During the pendency of the Rule 3.800 proceeding, petitioner filed on January 23, 2004, a motion for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure. (Ex. II at 616-63). The state circuit court appointed counsel for petitioner and granted a limited evidentiary hearing (*id.* at 708-10, 711-14, 972–1155). Following the evidentiary hearing, the circuit court denied the Rule 3.850 motion. (Ex. OO at 1526-1613). Petitioner appealed the decision to the First DCA, Case No. 1D08-5074 (Ex. QQ). The First DCA affirmed the decision per curiam without written opinion on January 25, 2010. *Davis v. State*, 29 So. 3d 1120 (Fla. 1st DCA 2010) (Table) (copy at Ex. SS). The mandate issued March 29, 2010. (Ex. VV).

On May 3, 2010, petitioner filed a petition for writ of habeas corpus in the state circuit court. (Ex. WW at 1–15). The circuit court construed the petition as a second or successive Rule 3.850 motion and summarily denied it. (*Id.* at 16-103). Petitioner filed a motion for rehearing and an attached amended habeas petition (*id.* at 104-20). The circuit court denied the motion for rehearing and attached amended petition (*id.* at 121–24). Petitioner appealed the decision to the First DCA, Case No. 1D10-4836 (Ex. XX). The First DCA affirmed the decision per curiam without written opinion on November 10, 2010. *Davis v. State*, 48 So. 3d 839 (Fla. 1st DCA 2010) (Table) (copy at Ex. ZZ). The mandate issued December 7, 2010. (Ex. AAA).

Petitioner filed the instant federal habeas action on September 30, 2010. (Doc. 1). Respondent does not contest the timeliness of the petition. (Doc. 20 at 4).

## SECTION 2254 STANDARD OF REVIEW

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218-19. Section 2254(d) provides, in relevant part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently

---

[2]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, — U.S. —, 130 S. Ct. 1171, 1173, 175 L. Ed. 2d 1003 (2010); *Bowles v. Sec'y for Dep't of Corr.*, 608 F.3d 1313, 1315 (11th Cir. 2010).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). If the state court decision <u>is</u> contrary to clearly established federal law, the federal habeas court must

independently consider the merits of the petitioner's claim.   *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the state court decision is not contrary to clearly established federal law, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.   The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).   An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). A state court, however, may "decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]" without running afoul of the "unreasonable application" clause. *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009).

When faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.   *See Gill v. Mecusker*, 633 F.3d 1272, 1287 (11th Cir. 2011) (*citing Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786,

178 L. Ed. 2d 624 (2011)). The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior Supreme Court decision. *See Richter*, 131 S. Ct. at 786; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts). In sum, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). The "unreasonable determination of the facts" standard is

implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill*, 633 F.3d at 1292.

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and §2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit recently declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. 930, 954, 127 S. Ct. 2842. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C.

§ 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 131 S. Ct. at 786.

Within this framework, the court will review petitioner's claims.

## DISCUSSION

Ground One: "The trial court erred in denying Appellant's motion to suppress statements made during custodial interrogation without Miranda warnings."

Petitioner asserts that certain statements he made to law enforcement should have been suppressed, because they were obtained when deputies questioned him about his wife's whereabouts while he was in custody, albeit on other unrelated charges, without giving him the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). (Doc. 1 at 5-6; doc. 2 at 2-5). Petitioner alleges that the trial court ruled the statements admissible because (1) the deputies were not questioning petitioner about anything relating to his wife's death, and (2) petitioner did not make any incriminating statements to the deputies. (*Id.*). Petitioner argues that regardless of whether the deputies intended to elicit incriminating statements, and regardless of whether his statements were in fact incriminating, the statements were inadmissible under *Miranda*, because the prosecutor used them to suggest to the jury that petitioner lied about his wife's whereabouts. (*Id.*).

Respondent does not assert an exhaustion or other procedural defense to this claim. (Doc. 20 at 4-8). Respondent argues that the clearly established federal law governing this claim is *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980), and that petitioner fails to show the state court's adjudication of the claim was contrary to, or an unreasonable application of *Innis*. (Doc. 20 at 6-8).

A.    Clearly Established Federal Law

In *Miranda v. Arizona*, the Supreme Court held:

> when an individual is taken into custody or otherwise deprived of his
> freedom by the authorities in any significant way and is subjected to
> questioning, the privilege against self-incrimination is jeopardized.
> Procedural safeguards must be employed to protect the privilege and
> unless other fully effective means are adopted to notify the person of his
> right of silence and to assure that the exercise of the right will be
> scrupulously honored, the following measures are required.  He must be
> warned prior to any questioning that he has the right to remain silent,
> that anything he says can be used against him in a court of law, that he
> has the right to the presence of an attorney, and that if he cannot afford
> an attorney one will be appointed for him prior to any questioning if he
> so desires.  Opportunity to exercise these rights must be afforded to him
> throughout the interrogation.  After such warnings have been given, and
> such opportunity afforded him, the individual may knowingly and
> intelligently waive these rights and agree to answer questions or make
> a statement.   But unless and until such warnings and waiver are
> demonstrated by the prosecution at trial, no evidence obtained as a result
> of interrogation can be used against him.

*Miranda*, 384 U.S. at 478-79.  "[T]he prosecution may not use statements, whether

exculpatory or inculpatory, stemming from custodial interrogation of the defendant

unless it demonstrates the use of procedural safeguards effective to secure the

privilege against self incrimination."  384 U.S. at 444.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297

(1980), the Supreme Court defined the meaning of "interrogation" under *Miranda*.

The Court in *Innis* held that "interrogation" occurs whenever a person in custody is

subjected to either (1) express questioning or (2) its functional equivalent.  *Innis*, 446

U.S. at 300-01, 100 S. Ct. 1682.  The "functional equivalent" prong is satisfied if the

person is subjected to any words or actions on the part of the police (other than those

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response, meaning any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. *Id.* 446 U.S. at 301-02. The inquiry into whether the police should have known their words or actions were reasonably likely to elicit an incriminating response focuses on the perceptions of the suspect, rather than the intent of the police. *Id.* That is not to say, however, that the intent of the police is irrelevant, because it may have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. *Id.*

The Supreme Court applied the foregoing rule to the circumstances surrounding Mr. Innis' statements, and found that Mr. Innis was not "interrogated" within the meaning of *Miranda*. The facts of *Innis* are that Patrolman Lovell arrested Mr. Innis for robbery with a sawed-off shotgun and advised him of his *Miranda* rights. 446 U.S. at 294. While the two men waited in the patrol car for other officers to arrive, Lovell did not converse with Innis other than to respond to Innis' request for a cigarette. *Id.* Within minutes, Sergeant Sears arrived at the scene of the arrest, and he also gave Mr. Innis the *Miranda* warnings. *Id.* Immediately thereafter, Captain Leyden and other police officers arrived. *Id.* Captain Leyden advised Mr. Innis of his *Miranda* rights. Mr. Innis stated that he understood those rights and wanted to speak with a lawyer. *Id.* Captain Leyden then directed that Innis be placed in a "caged wagon," a four-door police car with a wire screen mesh between the front and rear seats, and be driven to the central police station. *Id.* Three officers, Patrolmen Gleckman, Williams, and McKenna, were assigned to accompany Innis to the central station. *Id.* The officers placed Innis in the vehicle and shut the doors.

*Id.* Captain Leyden then instructed the officers not to question Innis or intimidate or coerce him in any way. *Id.* The three officers then entered the vehicle, and it departed. *Id.* While en route to the central station, Patrolman Gleckman initiated a conversation with Patrolman McKenna about the fact that the sawed-off shotgun had not been recovered. *Id.* Gleckman told McKenna that he was concerned that a handicapped child from a nearby school for handicapped children might find the weapon and shells and hurt or shoot himself or herself. *Id.* at 294-95. Patrolman McKenna concurred with Gleckman, commenting that the unfound weapon presented a safety issue, and officers should continue to search for it. *Id.* at 295. Mr. Innis interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located. *Id.* The officers returned to the scene of the arrest, and Captain Leyden again advised Innis of his *Miranda* rights. *Id.* Innis replied that he understood those rights, but wanted to "get the gun out of the way because of the kids in the area in the school." *Id.* Innis then led the police to the gun. *Id.*

The Supreme Court concluded that Mr. Innis was not "interrogated" within the meaning of *Miranda*. 446 U.S. at 302. The first prong of the definition of "interrogation" was not satisfied, because the conversation between Patrolmen Gleckman and McKenna included no express questioning of Innis; rather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from Innis was invited. *Id.* As to the second prong of the definition of "interrogation," the Court held it could not be fairly concluded that Innis was subjected to the "functional equivalent" of questioning. 446 U.S. at 303. The Court noted there was nothing in the record to suggest that the officers were

aware that Innis was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children; nor was there anything in the record to suggest that the police knew that Innis was unusually disoriented or upset at the time of his arrest. *Id.* at 302-03. Further, the record contained no evidence suggesting that the officers' remarks were <u>designed</u> to elicit a response from Innis. *Id.* at 303. The Court found it significant that the trial judge concluded it was "entirely understandable" that the officers would voice their concern for the safety of the handicapped children to each other. *Id.* at 303 n.9. The Court thus concluded that Mr. Innis was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him. *Id.* at 303.

      B.     Federal Review of State Court Decision

      Prior to trial, petitioner's counsel moved to suppress petitioner's statements to Deputy Fannin and Deputy Tanner after they arrested petitioner for violating a domestic violence injunction. (Ex. E at 941-43). At the hearing on the suppression motion, Deputy Tanner testified that at approximately midnight on March 25, 1999, he came into contact with petitioner at a trailer, while he (Tanner) was conducting a "welfare check" for JoAnn Davis, petitioner's wife, to determine whether she was "in any trouble." (Ex. H at 225-34). Tanner testified that Mrs. Davis had been reported missing and petitioner was reportedly the last person with whom she was seen (*id.*). Deputy Tanner testified that Deputy Fannin had discovered petitioner's possible location, so they knocked on the door of the trailer and received consent to enter. (*Id.*). Tanner testified that they discovered petitioner hiding behind a bookcase. (*Id.*). There were two outstanding warrants for petitioner's arrest, so Tanner and Fannin arrested petitioner on those warrants. (*Id.*). Tanner testified that neither he nor

Deputy Fannin questioned petitioner about the warrants for which he was arrested. (*Id.*). Tanner saw Mrs. Davis' vehicle in the front yard and, after arresting petitioner and while waiting for petitioner to dress to be transported, asked petitioner where Mrs. Davis was. (*Id.*). Petitioner responded that Mrs. Davis had dropped off their son and was going to Alabama for the weekend to sell a house. (*Id.*). Tanner asked petitioner whose vehicle was in the front yard and where the keys were. (*Id.*). Petitioner responded he did not know where the keys were, and that Mrs. Davis took them to Alabama with her. (*Id.*). Deputy Tanner testified that he found the car keys on a table in the trailer and asked petitioner if he could look inside the car. (*Id.*). Petitioner responded that it was not his car, so he could not give permission to look in it. (*Id.*). Tanner asked petitioner what was in the backseat of the car. (*Id.*). Petitioner responded that he did not know, "maybe some important items." (*Id.*). Tanner testified that he did not advise petitioner of his *Miranda* rights prior to asking petitioner the foregoing questions. (*Id.*). Tanner testified that he asked petitioner about Mrs. Davis in an attempt to locate her in light of the report that she was missing. (*Id.*). Tanner also testified that at the time he asked petitioner those questions, petitioner was not under arrest for anything in relation to Mrs. Davis' whereabouts. (*Id.*). Deputy Tanner knew at the time he arrested petitioner that petitioner was represented by an attorney in the case for which he was arrested, and further knew that petitioner had previously invoked his right to remain silent as to the charges in that case. (*Id.*).

The trial court expressed the belief that petitioner's responses to Deputy Tanner's questions were not obtained in violation of *Miranda*, because they were not incriminating. (Ex. H, pp. 235-36) ("What concerns me is that there's nothing

elicited from this witness, though, of anything incriminating allegedly said by the defendant at or after the time of his arrest. He made no confession, no admission to any criminal conduct. So why should I suppress these statements . . .?"). Defense counsel responded that petitioner's responses were incriminating, because the prosecutor intended to present petitioner's responses to the jury and argue that they were inculpatory. (*Id.* at 236). The prosecutor argued that the statements were admissible, because petitioner was not in custody for his wife's death at the time he made the statements – he was in custody on the separate offense of violating a domestic violence injunction. (*Id.*). According to the prosecutor, the officers were not required to advise petitioner of his *Miranda* rights prior to questioning him about an offense unrelated to the offenses for which he was arrested. (*Id.* at 236-37). The prosecutor informed the trial court that there had been a recent Supreme Court case "that says that if he's arrested for one crime it doesn't mean he can't be questioned . . . about another if he wants to voluntarily answer those questions". (*Id.* at 237). The prosecutor continued: "Now, he wasn't questioned about those domestic violence – if he had been arrested and they were to inquire of him as to the violation of those injunctions and the contents of that warrant, I think they would have had to have advise[d] him of his rights. But to inquire of those matters they did, it was not necessary." (*Id.*) The trial court denied the motion to suppress on the following grounds: "first of all, he was not being inquired of about anything with regard to the death of Mrs. Davis; and secondly, . . . he was not interrogated with regard to any incriminating statements involving the death of Mrs. Davis." (*Id*).

Petitioner appealed the trial court's decision to the First DCA. In his initial brief he argued that the *Miranda* opinion itself rejected the trial court's theory that

petitioner's statements were not subject to suppression because they were not directly incriminating. (Ex. J). Petitioner additionally argued that although the Sixth Amendment right to counsel was offense specific, under *Texas v. Cobb*, 532 U.S. 162, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001), *Miranda* rights were not offense specific and applied to each custodial interrogation. (*Id.*).

The State argued that the trial court properly admitted petitioner's statements, because he was not subject to interrogation or its functional equivalent at the time they were made. (Ex. K). The State argued that because the deputies had no knowledge that Mrs. Davis had been murdered, they could not have known that their "brief informational questions" about Mrs. Davis' whereabouts were likely to elicit incriminating statements from petitioner. (*Id.*). The State further argued that even if error occurred, it was harmless, because there was overwhelming evidence which proved the State's case beyond a reasonable doubt. (*Id.*).

Neither the trial court nor the appellate court cited any Supreme Court holdings in denying relief on this claim. A state court need not, however, cite to or even be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002). The First DCA affirmed the trial court's decision without written opinion. As previously discussed, when faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See Gill*, 633 F.3d at 1287 (*citing Harrington*, 131 S. Ct. at 786). The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists

could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See Harrington*, 131 S. Ct. at 786; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The First DCA's decision could have been based on the theory advanced by the State on direct appeal – that petitioner was not "interrogated" for purposes of *Miranda*. To so conclude, however, is contrary to and unreasonably applies Supreme Court precedent. No fairminded jurist could conclude that an officer's direct questioning of a person in custody, beyond matters normally attendant to arrest and custody, does not amount to interrogation under *Miranda* or *Innis*. Further, Deputy Tanner should have known that his questions about petitioner's wife were reasonably likely to elicit an incriminating response from petitioner. Deputy Tanner stated that the intent of his questioning was to investigate a report that Mrs. Davis was missing and possibly in danger. Tanner knew that petitioner was reportedly the last person with whom Mrs. Davis was seen and that Mrs. Davis' car was parked just outside the trailer where he arrested petitioner. Tanner observed something curious in the back seat of Mrs. Davis' car, and knew that petitioner had two outstanding warrants for which he was being arrested. It was reasonably foreseeable that Tanner's direct questions to petitioner regarding Mrs. Davis' location, the owner of the car in the front yard, the location of the keys to the car, whether he (Tanner) could look in the car, and what was in the backseat of the car, were reasonably likely to elicit a

response from petitioner that the prosecution could use at trial of an offense related to Mrs. Davis' disappearance or harm. In contrast with the facts of *Innis*, in which the defendant received *Miranda* warnings and was not asked a direct question by officers, petitioner did not receive *Miranda* warnings and was questioned directly by Deputy Tanner. Moreover, even if the state court's decision was based upon the theory that petitioner's responses were not incriminating, that theory is directly inconsistent with *Innis*, where the Supreme Court held that an incriminating response means "any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial." 446 U.S. at 301-02.

The First DCA's decision could have been based on the trial court's conclusion (as urged by the prosecutor at the suppression hearing) that the officers were permitted to directly question petitioner about his wife's disappearance without first advising him of his *Miranda* rights, because Mrs. Davis' disappearance was a separate matter for which petitioner was not in custody. The prosecutor's reference to a "recent" Supreme Court case was to *Texas v. Cobb*, 532 U.S. 162, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001).[3] In *Cobb*, the Supreme Court addressed the issue of whether an accused's invocation of his Sixth Amendment right to counsel for a charged offense extended to uncharged offenses factually related to the charged offense. Mr Cobb, while under arrest for an unrelated offense, confessed to a home burglary, but denied knowledge of a woman and child's disappearance from the home. 532 U.S. at 165. Mr. Cobb was indicted for the burglary, and counsel was appointed to represent him. *Id.* Cobb later confessed to his father that he had killed

---

[3]The Supreme Court decided *Cobb* on April 2, 2001, just prior to petitioner's April 30, 2001 suppression hearing.

the woman and child, and his father then contacted the police. *Id.* Officers arrested Cobb for the murders and advised him of his *Miranda* rights. *Id.* Cobb waived his rights and confessed to the murders. *Id.* at 165-66. Cobb argued on appeal that his confession should have been suppressed because it was obtained in violation of his Sixth Amendment right to counsel, which he claimed attached when counsel was appointed in the burglary case. *Id.* at 166. The Supreme Court held that the Sixth Amendment right to counsel is offense specific, and that invocation of the right to counsel as to a charged offense does not extend to a separate, uncharged offense even if the uncharged offense is "factually related" to the charged offense. *Id.* at 173.

The issue presented here, however, is not whether petitioner's right to counsel, which had attached in his domestic violence case, extended to the murder case. The issue is whether the police were required to give petitioner *Miranda* warnings prior to directly questioning him about his wife's disappearance. The prosecutor's argument (and the state trial court's apparent conclusion) that *Cobb* controlled the issue in petitioner's case overlooks the difference between the Sixth Amendment right to counsel and the Fifth Amendment right against compulsory self-incrimination. To construe *Cobb* as holding that the right against compulsory self-incrimination is offense specific and that *Miranda* warnings need not be administered unless the questioning relates to the crime for which the suspect is in custody or for which the suspect is eventually charged, is unreasonable. As the Supreme Court noted in *Arizona v. Roberson*, 486 U.S. 675, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988), the "inherent pressures of custodial interrogation . . . exist regardless of the number of crimes under investigation or whether those crimes have resulted in formal charges." 486 U.S. at 685; *see also Mathis v. United States*, 391 U.S. 1, 4-5, 88 S. Ct.

1503, 20 L. Ed. 2d 381 (1968) (declining to "curtail the warnings to be given persons under interrogation by officers based on the reason why the person is in custody.").

Supreme Court precedent makes clear that in determining whether *Miranda* protections apply to a particular situation, the focus is on whether the defendant was in custody and was being interrogated at the time he made the statements. Petitioner's statements were made when petitioner was in custody and in response to direct questioning by Deputy Tanner. The fact that Deputy Tanner did not know at the time he questioned petitioner that Mrs. Davis was dead as opposed to merely missing, is immaterial to *Miranda*'s "custodial interrogation" standard and does not exempt the questioning from *Miranda*'s coverage.

The undersigned is unable to glean any argument or theory that reasonably could have supported the state court's denial of relief on petitioner's claim. No fairminded jurist could disagree that the state court's denial of petitioner's claim is inconsistent with *Miranda* and its progeny. The First DCA's adjudication of Ground One is not entitled to deference under the AEDPA. That does not mean, however, that petitioner is entitled to federal habeas relief on this claim.

On habeas review, a conviction may be set aside only if the trial error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622–623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). Independent of petitioner's statements to Deputy Tanner, the State's evidence of petitioner's guilt of the first degree premeditated murder of his wife, summarized as follows, was overwhelming.

On the night of Thursday, March 25, 1999, Scott Hogeboom was working as a dispatcher at the Walton County Sheriff's Department. (Ex. H at 320-21).

Hogeboom testified that at 10:52 p.m., Cliff Yawn called and told Hogeboom the following: Petitioner had come over to Yawn's house at Church Hill Bayou Road (the Yawns and Mrs. Davis lived in neighboring trailers); petitioner asked Yawn to get Mrs. Davis' car; when Yawn returned with the car, petitioner and Mrs. Davis got into a verbal argument and left; and Yawn was concerned for Mrs. Davis' welfare. (*Id.* at 321-22, 324). At 10:54 p.m., Deputy Gray went to Church Hill Bayou Road to check on Mrs. Davis' safety. (*Id.* at 252, 255). Later that night, Cliff Yawn's wife called Hogeboom and asked if officers were still looking for Mrs. Davis' car. (*Id.* at 324–25). Hogeboom again dispatched an officer to investigate. (*Id.* at 325).

At 12:17 a.m. on Friday, March 26, Deputy Fannin was dispatched to the Yawn residence. (Ex. G at 253, 270). Fannin arrived at 12:30 a.m. and spoke with Mr. Yawn and others. (*Id.* at 253, 255). Fannin learned that neither Mrs. Davis nor her car was at the residence on Church Hill Bayou Road. (*Id.* at 253-54). Deputies Tanner and Fannin went to a trailer on Don Bishop Road. (*Id.* at 256-57). When they arrived, at 1:10 a.m., they saw Mrs. Davis' car, a white Dodge Dynasty, in the yard, and they confirmed that it was her car. (*Id.* at 256–57, 273, 276). The deputies saw that there was something under a blanket in the back seat, but the car was locked, so they did not investigate the car at that time. (*Id.* at 257). The deputies had two warrants for petitioner's arrest. (*Id.* at 262). When the deputies knocked on the trailer door, a man let them into the trailer and gave them permission to search it. (*Id.* at 257-59). The deputies found petitioner's son under covers on a bed, and petitioner hiding behind a bookcase. (*Id.* at 257, 259-61). The deputies arrested petitioner on the warrants, but their primary goal was to find Mrs. Davis. (*Id.* at 262). The deputies looked more closely into Mrs. Davis' car and saw what appeared to be hair

at the side of the blanket, so they used a "slim jim" to unlock the car door. (*Id.* at 264). They found Mrs. Davis' dead body under the blanket, her arms tied behind her back with a belt. (*Id.* at 265-66, 277-79). Later, they found the key to Mrs. Davis' car on a coffee table in the living room of the trailer. (*Id.* at 264, 274, 276).

Bryon Wright testified that he was staying in the same house with petitioner on March 25-26, 1999. (Ex. H at 308). Wright testified that when petitioner came home that night, he brought his son with him. (*Id.*). Wright thought he noticed taillights leaving when he let petitioner in the door. (*Id.* at 382-83). Mr. Wright testified he was there when the police arrived. (*Id.*).

Dr. Berkland, the medical examiner, testified that the cause of Mrs. Davis' death was manual strangulation. (Ex. H at 392). Berkland observed bruising to the left upper and lower eyelids, swelling on the left side of Mrs. Davis' face, bruising and swelling of her nose, contusions and swelling of her lips, some marks on her cheeks, dark purple spots under her right ear, abrasions on her face underneath her right chin and neck, abrasions on the left side of her jaw, a contusion and abrasion on her elbow, and injuries on her head and shoulder blades, all of which were caused by blunt force trauma, meaning the application of force to the area of skin and subcutaneous tissue, consistent with manual strangulation and having been hit with fists, which could have rendered her unconscious. (*Id.* at 377-400, Ex. I at 403-05). Dr. Berkland observed blood-tinged mucus inside the victim's nose, abrasions with blood in the auditory canal in the inside of her ear, and crusted blood over the abrasions on her ear. (Ex. I at 402-04). Berkland testified if the blood on Mrs. Davis' ear was moist, it may have transferred to another object, for example a pillow or blanket, but if it had dried, "maybe yes, maybe no," depending on whether some of

the crusty blood fell off or not. (*Id.* at 403). Berkland testified none of Mrs. Davis' injuries bled onto her clothing. (*Id.* at 404). Mrs. Davis's eyes showed numerous petechial hemorrhages attributable to strangulation. (Ex. H at 377-400). Berkland also observed bruising to Mrs. Davis' neck muscles deep within her neck, and a fractured right hyoid. (*Id.*). Mrs. Davis' liver was lacerated, which could have been caused by a forceful blow to the abdomen or kneeling on the abdomen. Berkland did not, however, observe an external injury to Mrs. Davis' abdomen. (*Id.* at 387-88). Berkland testified the contusions and abrasions to Mrs. Davis' body indicated she struggled during the strangulation. (*Id.* at 399-400). The absence of pre-mortem injuries to Mrs. Davis' wrists suggested she did not resist being tied up, perhaps because she was already unconscious or dead. (Ex. I at 401-02). Berkland testified that when he was shown photographs of petitioner's hands taken on March 26, 1999, and four or five days later, Berkland noticed "accentuation" up one of petitioner's hands that could represent contusions consistent with him having struck Mrs. Davis in the head with petitioner's fist. (*Id.* at 405-06).

James Clifton ("Cliff") Yawn testified that he lived at 427 Church Hill Bayou Road, and that there were two trailers at that address, one of which was occupied by Mrs. Davis. (Ex. G at 164, 166-67). Yawn had known the Davises for ten years, and knew they were married and had separated. (*Id.* at 165, 167). Yawn testified that on March 25, 1999, at a grocery store, petitioner told him he wanted to come over to his (Yawn's) trailer. (*Id.* at 169). Yawn testified that petitioner was convinced that if he could talk to Mrs. Davis for just five or ten minutes, he could talk her into coming back to him. (*Id.* at 169). Yawn knew that Mrs. Davis had a restraining order against petitioner, but Yawn did not object to petitioner's coming over, and they would "see

how it went from there." (*Id.*). Yawn testified that as he understood it, the restraining order did not keep petitioner away from his (Yawn's) trailer, just away from Mrs. Davis. (*Id.*). Yawn testified that late that afternoon, petitioner appeared in his yard, having been given a ride by someone. (*Id.* at 170-71). Mrs. Davis was not home, and her car was not there. (*Id.* at 172). Yawn did not see everything petitioner did while he waited for Mrs. Davis to return, but Yawn thought petitioner went into Mrs. Davis' trailer, possibly to check the answering machine. (*Id.* at 172-73). Some time later, when it was dark, Yawn's nephew, who lived nearby, came to Yawn's door and told him there was someone outside who wanted to talk to him. (*Id.* at 173). Yawn walked out of his trailer and between the two trailers and saw Mr. Penik in his pick-up truck. (*Id.* at 174). Yawn did not see Mrs. Davis. (*Id.*). Yawn testified that petitioner came out of Mrs. Davis' trailer and asked Yawn to get Mrs. Davis' car for her. (*Id.* at 174-75). Yawn told petitioner to tell Mrs. Davis that he (Yawn) needed keys to her car, and petitioner went back into the trailer and came out with the keys. (*Id.*). Yawn observed that petitioner appeared sweaty and talked harshly to Penik. (*Id.* at 175-76). Yawn went with Penik to retrieve Mrs. Davis' car, which was located near Penik's residence. Yawn discovered that petitioner had given him the wrong key, but Yawn was able to get into the car, which was already running, and drove Mrs. Davis' car back to her trailer home. (*Id.* at 176-77).

On March 26, 1999, Cliff Yawn gave a sworn statement to police indicating that when he returned to his trailer in Mrs. Davis' car, he did not see Mrs. Davis. (*Id.* at 183). On April 29, 1999, Yawn asked police if he could give another statement, and in that statement he contradicted his earlier statement about not seeing Mrs. Davis. (*Id.* at 183-86). At trial, Yawn testified he had initially sworn he did not see

Mrs. Davis because he was afraid. (*Id.* at 183). Yawn said he did not know why he was afraid. (*Id.*). The version Yawn gave at trial was that when he got back to his trailer with Mrs. Davis' car, he went to the doorway of Mrs. Davis' trailer and saw her lying on the couch. (*Id.* at 178). Yawn testified that it appeared to him as if petitioner had knocked Mrs. Davis unconscious and that Mrs. Davis' arms were restrained behind her back. (*Id.* at 178, 181). Petitioner told Yawn not to worry and that Mrs. Davis was all right, and then threw a jacket over Mrs. Davis' face and laughed. (*Id.* at 178-79). Yawn testified that he then went home and called 911. (*Id.* at 178-80). When he (Yawn) and his wife came outside, they saw that Mrs. Davis' car was gone. (*Id.* at 180). They went into Mrs. Davis' trailer and saw that she and her son were not home. (*Id.* at 180).

Mr. Yawn initially denied owing money to Mrs. Davis and denied owing money to her for drugs. (Ex. G at 197-98). On further questioning, Yawn acknowledged that he had previously owed Mrs. Davis a couple of hundred dollars. (*Id.* at 198). Yawn testified that he paid Mrs. Davis by giving her a pick-up truck. (*Id.*). When asked if the money he owed her was from her selling drugs, Yawn testified that he did not know exactly what he borrowed the money for, but he ultimately acknowledged that the money could have been for drugs. (*Id.*). Yawn testified that petitioner was also involved in drugs and obtained them from Mrs. Davis. (*Id.* at 199). Yawn denied that he tied Mrs. Davis' hands behind her back, put her in her car, and drove her to petitioner's house. (*Id.* at 199-200).

Christopher Penik testified that at approximately 8:00 p.m. on March 25, 1999, Mrs. Davis appeared at his home seeking help because she had locked her keys in her car "up the road". (Ex. H at 201-03). Penik unsuccessfully tried to unlock the car

doors with a coat hanger, and then drove Mrs. Davis, in his car, to Mrs. Davis' home to retrieve her spare key. (*Id.* at 203). Penik testified that Mrs. Davis' car was still running when he attempted to unlock it. (*Id.*). At Mrs. Davis' direction, Mr. Penik drove into a mobile home park and waited in the car. (*Id.* at 204). Penik watched Mrs. Davis walk between two trailers, and he never saw her again. (*Id.* at 204, 209). Mr. Penik was parked not more than twenty feet from the trailer, facing it, with his window partially down, and he heard no sounds of a struggle. (*Id.* at 210). Ten to twenty minutes later, two men came from between the two trailers. (*Id.* at 205-07, 209). One of the men was Cliff Yawn, and the other was petitioner. (*Id.* at 176, 205--06). Mr. Penik testified that petitioner appeared sweaty and agitated. (*Id.* at 207). Petitioner was hostile to Penik, asking, "Who the fuck are you and what the fuck are you doing here?" (*Id.*). When petitioner found out that Mrs. Davis had locked her keys in her car, he went to get a spare key. (*Id.* at 208). Petitioner told Yawn to take the key and go with Penik to pick up the car. (*Id.*). Penik drove Yawn to Mrs. Davis' car and dropped him off. (*Id.*).

Four witnesses testified that prior to the killing, petitioner had expressed a desire to kill his wife. Chad Rushing, a friend of petitioner's prior to the murder, testified that when he was with petitioner in jail two years prior to the killing, petitioner said that if his wife tried to put him in jail or take his son away, he would kill her. (Ex. H at 285, 293). Rushing testified that he and petitioner were both in jail in March of 1999, just after the killing. (*Id.* at 286-87). Rushing walked into the jail's kitchen and saw petitioner sitting by himself. (*Id.*). The look on petitioner's face and his red eyes caused Rushing to ask petitioner what was wrong, and petitioner responded, "I killed her." (*Id.*). Rushing asked petitioner whom he killed, and

petitioner admitted, "I killed JoAnn." (*Id.*). Rushing did not tell anyone what petitioner had said until one year later, on April 25, 2000, when he told Investigator Steve Sunday. (*Id.* at 288). Rushing testified that he had previously been convicted of seven or eight felonies. (*Id.* at 284).

Patrick Morton, a friend of Cliff Yawn's, testified that nine days before he heard about the killing, petitioner said he was thinking about killing his wife, and had made a hand gesture to indicate strangulation. (Ex. H at 246, 248-49). Mr. Morton advised petitioner that if he could not get along with his wife they should go their separate ways. (*Id.* at 246-47). Brandon Woods and David Blair worked with petitioner during the four or five days leading up to the killing. (*Id.* at 217, 219, 233). Woods and Blair testified that during that period, petitioner talked every day about wanting to kill his wife. (*Id.* at 217, 221). According to Mr. Blair, that was all petitioner talked about. (*Id.* at 221). Mr. Blair further testified that on one occasion, petitioner said he would take his wife for a long walk off a short pier, and only he would come back. (*Id.*). On another occasion, petitioner stated he would kill his wife with a syringe full of cocaine in the back of her neck. (*Id.*). According to Mr. Blair, petitioner also said he "wished" he could kill his wife. (*Id.*). Petitioner told Blair he wanted to get back together with his wife, but he knew it would not happen. (*Id.* at 220). On March 25, 1999, petitioner asked Blair to call Mrs. Davis and tell her he (Blair) had a truck for sale to entice her out of the house. (*Id.* at 222).

In view of the evidence of petitioner's guilt, independent of petitioner's statements to Deputy Tanner, the trial court's erroneous admission of petitioner's statements to Tanner could not reasonably have had a substantial and injurious effect

or influence in determining the jury's verdict, and was thus harmless. Petitioner is not entitled to federal habeas relief on Ground One.

Ground Two: "Petitioner was deprived his rights under the Fifth (5[th]), Sixth (6th), and Fourteenth (14th) Amendment[s] of the United States Constitution when Appellant's counsel failed to raise issue(s) on Petitioner's direct appeal."

Petitioner contends he received ineffective assistance of appellate counsel based upon counsel's failure to raise the following argument on direct appeal:

> The trial court committed a fundamental error in finding Davis guilty of an uncharged crime in the middle of trial and allowing the State to use that finding as proof necessary as an element of murder, and/or, alternatively, committing fundamental error by constructively amending the indictment violating Due Process of Law.

(Doc. 1 at 6). Petitioner concedes that the State nolle prossed two misdemeanor charges of violation of a domestic violence injunction, but argues that the trial court constructively amended the indictment and found him guilty of violating the domestic violence injunction, an uncharged crime, by denying defense counsel's motion in limine seeking to exclude introduction of the injunction into evidence, and permitting admission of the injunction on the ground that it was relevant to the issue of intent. (Doc. 1 at 6; Doc. 2 at 6-8; Doc. 33 at 3-5). Petitioner additionally contends appellate counsel should have argued that the trial court's admission of the injunction violated Florida Statutes § 90.404, because it constituted collateral crime evidence which was inherently prejudicial, and the prosecutor failed to comply with the notice provisions of that statute. (Doc. 2 at 7-8; Doc. 33 at 3-5). Petitioner argues that if appellate counsel had challenged the trial court's ruling on direct appeal, there is a reasonable probability the appellate court would have reversed the conviction and remanded for a new trial. (Doc. 1 at 6.).

Respondent asserts that petitioner's argument that the trial court found him guilty of an uncharged crime is frivolous; therefore, appellate counsel was not ineffective for failing to raise it. (Doc. 20 at 8). Respondent additionally argues that the likelihood of obtaining appellate relief on the issue of the trial court's denial of petitioner's motion in limine was so slim that appellate counsel reasonably could have decided to focus on the suppression issue instead. (*Id.* at 8-11). Thus, the First DCA's denial of this claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

A.    Clearly Established Federal Law

The standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285,120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted). The two components of an ineffectiveness claim under *Strickland* are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. *Strickland*, 466 U.S. at 697. The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691. Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal. *Jones v. Barnes*, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). To demonstrate prejudice, petitioner must show a

reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, petitioner would have prevailed on appeal. *See Robbins*, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the *Strickland* standard with regard to claims of ineffective assistance of appellate counsel. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (*quoting Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)). Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits. *Diaz v. Sec'y Dep't of Corrs.*, 402 F.3d 1136, 1142 (11th Cir. 2005); *Atkins v. Singletary*, 965 F.2d 952, 957 (11th Cir. 1992); *Francois v. Wainwright*, 741 F.2d 1275, 1285-86 (11th Cir. 1984). Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal. *Nyhuis*, 211 F.3d at 1344 (*citing Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988)).

B.    Federal Review of State Court Decision

Petitioner raised this claim in his state habeas petition alleging ineffective assistance of appellate counsel. (Ex. T). The First DCA denied the petition on the merits in a per curiam decision without written opinion. (Ex. V).

The trial record shows that defense counsel moved in limine to prevent State witnesses from testifying that the victim was afraid of petitioner, that a domestic violence injunction existed against petitioner, and that a warrant had been issued for

petitioner's arrest for violating the injunction. (Ex. E at 944-45). A hearing on the motion was held the first day of trial. Defense counsel argued that the prejudicial effect of such evidence outweighed its probative value. (Ex. G at 122-31). The trial court ruled that the State could not adduce evidence that the victim had said she was afraid of petitioner, but the State could offer, as proof of premeditation, evidence of the existence of the injunction and petitioner's intentional violation of that injunction. (Ex. G at 124, 131; Ex. H at 242). Defense counsel then posed a challenge to admission of the injunction on the ground that it constituted collateral crime or "*Williams* rule" evidence, and the State had not provided the defense with ten days' notice of its intent to offer it, as required by Florida Statutes § 90.404. (Ex. H at 241-43). Defense counsel did not dispute that the State had provided a copy of the injunction to the defense well over ten days prior to trial. (*Id.* at 243). The trial court overruled defense counsel's objection. (*Id.* at 242-43).

With regard to appellate counsel's failure to challenge to the trial court's ruling on the ground that the court convicted petitioner of an uncharged offense, that issue was not preserved at trial, and appellate counsel's failure to raise that argument on direct appeal was not unreasonable. With regard to appellate counsel's failure to challenge the trial court's ruling on the ground that evidence of the injunction was unduly prejudicial and the prosecutor failed to comply with the notice provisions of § 90.404, the First DCA's denial of petitioner's claim could have been supported by the argument that appellate counsel reasonably selected a stronger issue, that is, the suppression issue. As discussed *supra* in Ground One, the suppression issue was a strong issue to raise on direct appeal. A challenge to the trial court's admission of the "*Williams* rule" evidence, however, was far less likely to succeed because (1) the

evidence was relevant to petitioner's intent, (2) the prejudicial effect of the evidence did not outweigh its probative value, and (3) the defense did not dispute it had notice of the State's intent to use the evidence (indeed, the record shows that on April 17, 2000, over a year prior to trial, the State served a notice of its intent to introduce evidence of other crimes, wrongs, or acts, including evidence that in Case No. 99-494A-MM, between February 16 and 21, 1999, petitioner violated the provisions of a domestic violence injunction obtained by Mrs. Davis in Case No. S99-1029-02, by driving to her residence, repeatedly driving by a friend's house where she had been hiding, telephoning or contacting her directly or indirectly at all hours of the night, and leaving messages and notes at her residence.  (Ex. E at 870-73)).  The First DCA could have concluded, reasonably, that appellate counsel reasonably selected a stronger issue in order to maximize the likelihood of success of on appeal.  The state court's rejection of petitioner's claim was not contrary to *Strickland*, was not an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.  Petitioner is not entitled to federal habeas relief on Ground Two.

Ground Three, Subclaim A:  "Whether Petitioner's rights to effective assistance of counsel, as guaranteed by the Fifth (5th), Sixth (6th), and Fourteenth (14th) Amendments of the United States Constitution, were violated and/or deprived . . . when counsel failed to object and move for mistrial when the State interjected facts not in evidence."

Petitioner contends his trial counsel performed deficiently by failing to object to the following question posed by the prosecutor to the medical examiner, "[Investigator] Steve Sunday testified they [photographs of petitioner's hands] indicate the bruising of the defendant's hand.  Would the bruising shown on that hand be consistent with him having struck Mrs. Davis in the head with his fist?"  (Doc. 1

at 7-8; Doc. 2 at 9-11; Doc. 33 at 8-11). The medical examiner answered, "that's certainly consistent." (*See* Ex. I at 405). Petitioner contends trial counsel should have objected to the prosecutor's question and the medical examiner's answer on the ground that the question assumed facts not in evidence, and the medical examiner was not qualified to testify whether petitioner's hands were bruised or injured, because he never examined petitioner. (Doc. 1 at 7-9; Doc. 2 at 9-11; Doc. 33 at 8-11). Petitioner argues that defense counsel admitted at the postconviction evidentiary hearing that the reason he did not object to the prosecutor's question was, "I just missed it"; therefore, counsel's failure to object was not a strategic decision by counsel. (Doc. 1 at 9-10; Doc. 2 at 9-11; Doc. 33 at 8-11).

Petitioner additionally contends that defense counsel should have objected to the prosecutor's closing argument on the ground that he argued facts not in evidence. (Doc. 1 at 8-10; Doc. 2 at 9-11; Doc. 33 at 8-11). Petitioner asserts the prosecutor argued that Investigator Sunday observed that petitioner's hands were bruised when he was arrested, and the medical examiner testified that the bruising was consistent with petitioner's striking another individual, when such facts were not in evidence. (*See id.*). Petitioner contends there is a reasonable probability the jury would not have convicted him had counsel objected to the prosecutor's question to Dr. Berkland and the improper comment during closing argument. (*Id.*).

Respondent contends the state circuit court found as fact that defense counsel's testimony at the postconviction evidentiary hearing was more credible than petitioner's testimony, and this factual finding underlaid the court's legal conclusions as to all of petitioner's claims of ineffective assistance of counsel. (Doc. 20 at 12-14). Specifically with regard to Ground Three, subclaim A, respondent contends defense

counsel's failure to object was not prejudicial and in fact helped the defense, because it enabled the defense to elicit stronger testimony by the medical examiner that the bruising was work-related. (*Id.* at 17).

A. Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984), as set forth above. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (*citing Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688-89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial – for example, what witnesses he presented or did not present – were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (*citing Chandler*, 218 F.3d at 1314-15 n.15). Further, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (*citing Strickland*, 466 U.S. at 690); *Lancaster*

*v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (*quoting Chandler*, 218 F.3d at 1317). "'Absolute rules would interfere with counsel's independence – which is also constitutionally protected – and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (*quoting Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of *Strickland*, petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (*quoting Strickland*, 466 U.S. at 693). Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland* at 694.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Strickland*, 466 U.S. at 694-95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of the trial, not on

appeal.  *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (*citing Strickland*, 466 U.S. at 694-95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

B.     Federal Review of State Court Decision

Petitioner raised this claim as Ground #2 in his Rule 3.850 motion.  (Ex. II at 620–24).  In the state circuit court's written decision denying the motion, the court correctly cited the *Stricklan*d standard as the applicable legal standard.  (Ex. OO at 1532–33).  The circuit court also made the following factual findings with regard to all of petitioner's ineffective assistance of counsel claims:

> In the instant case, based upon the Court's own knowledge and judicial notice and trial counsel, Mr. Petersen's, testimony [reference to evidentiary hearing transcript, Ex. II at 972–1155], the Court expressly finds that trial counsel was and is a highly experienced and eminently qualified criminal defense trial attorney.  Judicial scrutiny of counsel's performance must be highly deferential and the Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland, [s]upra.*  When courts examine the performance of an experienced trial counsel the presumption is even stronger.  *Chandler v. U.S., 218 F.3d 1305 (11th Cir. 2000).*  Further, on the issues of trial strategy, the Court specifically finds that trial counsel emphatically testified that he fully discussed with the Defendant every available defense and issue of trial strategy in numerous pretrial meetings; and that the Defendant directly agreed to his tactical decisions and informed trial counsel that he was comfortable with trial counsel making the decisions after input from the Defendant. [reference to evidentiary hearing transcript].  The Court specifically

finds that the Defendant's testimony to the contrary is not credible. The Court accepts the testimony of trial counsel that he competently and vigorously advanced the interests of the Defendant and that his representation was far more than sufficient under the *Strickland* standard; Defendant has neither proved deficient performance nor prejudice on any of his grounds for relief.

(Ex. OO at 1533). Specifically with regard to Ground Three, subclaim A, the state circuit court adjudicated the claim as follows:

The State concedes that the prosecutor Clayton Adkinson incorrectly stated in direct examination of the medical examiner, Dr. Michael Berkland, that Investigator Steve Sunday had <u>testified</u> that he saw bruising on the hands of the Defendant when the Defendant's hands were photographed by Investigator Sunday on the day of his arrest and a few days later. Trial counsel conceded at the evidentiary hearing that he did not object or move for mistrial based on the prosecutor's misstatement of the evidence.

The Defendant claims that trial counsel should have objected that the prosecutor "interjected facts not in evidence." While it is true that Investigator Sunday did not specifically testify that the photographs would "indicate the bruising of the Defendant's hand" [reference to trial transcript], it was painfully obvious that Investigator Sunday did actually see the areas of alleged bruising on the Defendant's hands which were described in Dr. Berkland's testimony and displayed in the photographs in evidence as State's Trial Exhibits 29, 30, 31, and 32, as Investigator Sunday personally made the photographs of the specific areas of the Defendant's hands. The Defendant also complains that trial counsel should have objected to the prosecutor's argument that Investigator Sunday "observed the Defendant's hands the morning of this incident and that he had bruising on his hands and that he took photographs four or five days later that still reflected these (sic) bruising." [reference to trial transcript]. The Court specifically finds that this argument of the prosecution contains no incorrect statements. Investigator Sunday did observe the hands and they did have bruising as Dr. Berkland testified.

Trial counsel testified at the evidentiary hearing that his lack of objection was probably due to his failing to realize that Investigator Sunday had not actually testified he saw bruising. Trial counsel further testified that if he had objected, the prosecutor could have either recalled Investigator Sunday to so testify or simply relied on what he believed was admissible expert opinion concerning the photographs' depiction of bruising by the medical examiner, Dr. Berkland. Trial counsel further testified that he personally saw that the photographs in evidence depicted bruising or calluses which could either be explained by the Defendant's striking someone or injuring them in his work as a construction worker. Trial counsel's testimony is that he chose as a tactical decision to demonstrate through cross examination of the medical examiner that the bruising or calluses in the photographs could also be consistent with work injuries. [reference to evidentiary hearing transcript]. The prosecutor's misstatement concerning Investigator Sunday's testimony did not prejudice the Defendant and any objection would not have probably resulted in a different outcome. *Strickland v. Washington, 466 U.S. 668 (1984).* It was a reasonable trial strategy by trial counsel not to object to Dr. Berkland's opinion testimony concerning the alleged bruising depicted by the four photographs and instead to point out by cross-examination that the bruising could be explained as work injuries.

(Ex. OO at 1534–36).

Petitioner raised this issue in his initial brief on appeal of the circuit court's denial of his Rule 3.850 motion. (Ex. QQ). The First DCA affirmed the lower court's decision without written opinion. (Ex. SS).

The trial transcript reveals that Investigator Sunday testified he took two sets of photographs of petitioner's hands, the first set on the day petitioner was arrested, March 26 1999, and the second set four or five days later. (Ex. H at 303-04, 369-70). Investigator Sunday testified that he observed petitioner's hands on both occasions, and Sunday identified two of the photographs he took on March 26, 1999 (State's

Exhibits 29 and 30), and two of the photographs he took four or five days later (State's Exhibits 31 and 32). (Ex. H at 370-71). Sunday testified that the photographs accurately depicted petitioner's hands as he observed them on both occasions. (*Id.*).

During questioning of Dr. Berkland, the prosecutor showed Dr. Berkland State's Exhibits 29 and 30 and asked, "Steve Sunday testified they indicate the bruising of the defendant's hand. Would the bruising shown on that hand be consistent with him having struck Mrs. Davis in the head with his fist?" (Ex. I at 405). Dr. Berkland answered, "That's certainly consistent." (*Id.*).

Petitioner has not shown a reasonable probability of a different outcome at trial had defense counsel objected to the prosecutor's misstatement when questioning Dr. Berkland, regardless of the reason counsel failed to object. At the postconviction evidentiary hearing, petitioner's trial counsel, Mr. Petersen, testified that even if he had objected, it would have been easy for the prosecutor to recall Investigator Sunday and elicit the missing testimony. (Ex. LL at 1088-89). Mr. Petersen testified he knew that if the prosecutor recalled Investigator Sunday, Sunday would have testified that he photographed bruises on petitioner's hands. (*Id.* at 1091-92). This belief was reasonable in light of Investigator Sunday's comment during petitioner's recorded interview, in which Investigator Sunday stated, "Yeah, you've got some bruises on your hands." (Ex. JJ at 797). Additionally, Mr. Petersen testified that even without Investigator Sunday's testimony that he saw bruising on petitioner's hands, Dr. Berkland's expert opinion as to whether the condition of petitioner's hands depicted in the pictures was consistent with him having struck Mrs. Davis in the head with his fist was admissible. (Ex. LL at 1089-90). Mr. Petersen testified that rather than

attempt to suggest to the jury that the photographs did not depict any markings on petitioner's knuckles, he made a tactical decision to explain the markings as consistent with petitioner's occupation as a construction worker. (*Id.* at 1090-91). This is evidenced by Mr. Petersen's questioning of Dr. Berkland:

> Q. Dr. Berkland, those pictures you just looked at.
>
> A. Yes, sir.
>
> Q. You did not see Mr. Davis at all, did you?
>
> A. No, I did not.
>
> Q. Could you tell from those pictures if these were in fact bruises, or dirty calluses?
>
> A. Sometimes there can be areas of what we call hyperpigmentation. If you see that, usually they're fairly uniform across the knuckles. In this case there's actually a little bit of accentuation on up the hand on one of them and they look like they certainly could represent contusions.
>
> Q. Or they could be calluses.
>
> A. Certainly there may be an underlying callus there that is contused as well, that's correct.
>
> Q. And you know Mr. Davis is a construction worker.
>
> A. I didn't know that.
>
> Q. Would those hands be consistent with construction workers?
>
> A. They're certainly used hands.

(Ex. I at 406).

In light of this record, the state court reasonably concluded that petitioner failed to demonstrate Mr. Petersen's failure to object to the prosecutor's misstatement during cross-examination of Dr. Berkland was unreasonable or prejudicial to petitioner.

With regard to the prosecutor's allegedly improper comments during closing argument, petitioner challenges the state court's factual finding that the prosecutor's argument contained no incorrect statements. Petitioner contends that the record clearly demonstrates Investigator Sunday never testified during trial that he observed bruises on petitioner's hands; and in fact testified during a pretrial hearing on March 31, 1999, that he did not observe any bruises. Petitioner attaches to his memorandum a portion of Investigator Sunday's pretrial testimony (doc. 2, Ex. A), and four photographs of petitioner's hands, two taken March 26, 1999, and two taken March 31, 1999 (doc. 2, Ex. B).

During the pretrial hearing, Investigator Sunday testified:

> The first day that I photographed his hands they were real dirty. And now since we have had a few days, bruising can often show up several days after the incident. Or if someone has been in an altercation, it may not show up right away. We would like to take a look at those hands. I was informed by the nurse that there may be a bruise upon his knuckle area and that's why I would like to take a look at that and a scab.
> . . . .
> When I examined that morning there appeared to be a scar or scratch or something over one of the hands. I don't recall which one. But his hands and the knuckles were all really dirty when I looked at them.

(Ex. PP at 5,18). Investigator Sunday did not actually state that he did not observe any bruises. Petitioner's evidence of Sunday's pre-trial testimony is insufficient to

rebut the state court's factual finding. Further, although the trial transcript demonstrates that during the prosecutor's <u>questioning of Dr. Berkland</u>, the prosecutor incorrectly stated that Investigator Steve Sunday had testified that the photographs indicated bruising on petitioner's hand (as noted by the state court, the State conceded this point), this does not prove that the prosecutor's statement during <u>closing argument</u> was inaccurate.

The prosecutor's statement during closing argument, taken in its full context, is this:

> The evidence that you have before you is that JoAnn Davis was struck, was hit several times. The evidence that you have before you is that Investigator Steve Sunday observed the defendant's hands the afternoon – or the early morning of this incident and that he had bruising on his hands and that he took photographs four or five days later that still reflected these bruises. And you'll have the opportunity to take the photographs back there with you. So it's consistent, the injuries on the defendant are consistent with the injuries that JoAnn Davis received.

(Ex. I at 424).

The prosecutor's comments could be construed as accurately stating that the evidence showed (1) Investigator Sunday observed petitioner's hands the morning of his arrest (this fact could be reasonably inferred from Sunday's testimony), (2) petitioner had bruising on his hands (this fact could be reasonably inferred from the photographs themselves and Dr. Berkland's testimony), and (3) Sunday took photographs four or five days later that still reflected the bruises (this fact could be reasonably inferred from Sunday's testimony). Petitioner has not clearly and convincingly rebutted the state court's factual finding that the prosecutor's closing argument was accurate. Based upon the state court's finding that the prosecutor's statement during closing argument was not inaccurate, petitioner failed to show

ineffective assistance with regard to defense counsel's failure to object to the argument.

The state court's rejection of petitioner's claim was not contrary to *Strickland*, was not an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on Ground Three, subclaim A.

Ground Three, Subclaim B: "Whether the Petitioner's rights to effective assistance of counsel, as guaranteed under the Sixth and Fourteenth Amendments of the United States Constitution, were violated by counsel's failure to object and move for a mistrial when the State elicited opinion testimony from the medical examiner of which he was not an expert, and whether the state court violated the Petitioner's rights to a full, fair, and adequate evidentiary hearing, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, when the state court refused to argue [sic] the ineffective assistance claim as stated herein."

This claim is related to the previous claim. In this claim, petitioner contends defense counsel performed ineffectively by failing to object to Dr. Berkland's testimony that the condition of petitioner's hands as depicted in the photographs was consistent with his having struck Mrs. Davis in the head with his fist, on the ground that Dr. Berkland had never examined petitioner's hand and was therefore not qualified to give this opinion. (Doc. 1 at 11; Doc. 2 at 11-13). Petitioner contends he raised this claim as part of Ground Two in his Rule 3.850 motion, but the state court refused to allow him to litigate it at the evidentiary hearing and failed to address the merits of the claim. (Doc. 1 at 12-14; Doc. 2 at 11-13; Doc. 33 at 11-12). Petitioner argues that the state court violated his due process rights by refusing to permit him to litigate the claim. (*Id.*).

Respondent asserts a procedural default defense, arguing that petitioner failed to raise this claim in the state postconviction proceedings. (Doc. 20 at 14).

Respondent states that during the postconviction evidentiary hearing, petitioner's counsel summarized all of the grounds for relief. As to Ground Two of the postconviction motion, petitioner's postconviction counsel stated the claim as trial counsel's failure to object to the prosecutor's misstatement of Investigator Sunday's testimony, and did not mention a related claim of trial counsel's failure to object to Dr. Berkland's testimony. (Doc. 20 at 14-15). Respondent asserts that later in the evidentiary hearing, petitioner's postconviction counsel attempted to question trial counsel as to why he did not impeach Dr. Berkland's testimony (that the condition of petitioner's hands as depicted in the photographs was consistent with his having struck Mrs. Davis in the head with his fist), with Investigator Sunday's testimony at the March 31, 1999, pretrial hearing where Sunday stated, "The first day I photographed his hands, they were real dirty and now, since we have had a few days, bruising can often show up several days after the incident." (*Id.* at 15). The prosecutor objected to postconviction counsel's question on the ground that trial counsel's failure to impeach Dr. Berkland was not an issue raised in the Rule 3.850 motion. (*Id.* at 16). The state postconviction court sustained the objection on the ground that trial counsel's failure to impeach Dr. Berkland was not "within the parameters" of Ground Two of the Rule 3.850 motion. (*Id.*). Respondent contends the state court thus disposed of the claim based upon an independent and adequate state procedural bar; therefore, the claim is procedurally defaulted for federal habeas purposes. (*Id.*).

Notwithstanding the exhaustion issue, Petitioner's claim is without merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied

on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Florida Statutes § 90.704 provides

> The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.

Fla. Stat. § 90.704 (1995). Dr. Berkland qualified as an expert in the area of forensic and criminal pathology. (Ex. G at 373-74). Dr. Berkland formed his opinions based upon his personal autopsy of the victim and his viewing of the photographs of petitioner's hands at trial. (*Id.* at 375-406). In Florida, this was sufficient to establish a proper predicate for Berkland's testimony that the condition of petitioner's hands was consistent with his having struck the victim with his fist. *See Capehart v. State*, 583 So. 2d 1009, 1012-13 (Fla. 1991) (holding that proper predicate was established for medical examiner's expert testimony regarding cause of victim's death and condition of body – even though examiner did not perform autopsy nor was autopsy report admitted into evidence – where examiner testified as to her qualifications as a medical examiner and that she formed her opinion based upon autopsy report, toxicology report, evidence receipts, photographs of body, and other paperwork filed in the case). Petitioner has not shown that his proposed argument (that Berkland was not qualified to provide an opinion as to whether the condition of petitioner's hands as depicted in the photographs was consistent with petitioner having struck Mrs. Davis in the head with his fist) provided a meritorious basis for defense counsel to object to Dr. Berkland's testimony. Petitioner fails to satisfy the deficient performance and prejudice prongs of *Strickland* with regard to Ground Three, Subclaim B.

Ground Four: "Whether Petitioner's rights to effective assistance of counsel, as guaranteed by the Fifth (5th), Sixth (6th), and Fourteenth (14th) Amendments of the United States Constitution, were violated and/or deprived . . . when counsel failed to present exculpatory evidence to the jury."

Petitioner asserts that prior to trial he discussed with defense counsel the fact that Dr. Berkland testified in his deposition that he observed semicircular fingernail marks embedded in the victim's neck, but that petitioner's nails were and always had been cropped far below the ends of his fingertips. (*Id.* at 14-16; Doc. 2 at 13-15; Doc. 33 at 12-14). Petitioner contends defense counsel should have investigated the autopsy photographs depicting the semicircular marks on the victim's neck and presented evidence that petitioner's fingernails were incapable of causing the marks on the victim's neck. (*Id.*).

Respondent argues that the state court reasonably determined the facts and neither contradicted nor misapplied *Strickland* in denying relief on this claim. (Doc. 20 at 17–18). Respondent asserts that the state court found as fact that defense counsel made a tactical decision not to adduce evidence regarding the fingernail marks on the victim's neck to avoid the possibility of the State's using in rebuttal petitioner's recorded statement to law enforcement in which petitioner admitted he seized the victim by the throat. (*Id.*).

Petitioner raised this claim as Ground #3 in his Rule 3.850 motion. (Ex. II at 624-26). The state circuit court adjudicated the claim as follows:

> The Defendant complains that his trial counsel was ineffective for failing to point out in cross-examination of medical examiner Dr. Berkland and in closing argument that the photographs of his hands introduced as State's Exhibits 29 through 32 demonstrated that his fingernails were too short to have caused fingernail marks on the victim's throat testified to by Dr. Berkland.

Trial counsel testified that he knew that if he cross-examined Dr. Berkland as to whether the Defendant's nails were too short to cause the marks, the prosecutor was in a position to attempt to offer in evidence the taped interview of the Defendant [reference to State's Evidentiary Hearing Exhibit 1] in which he admitted seizing the victim by the throat in an altercation as well as having tied her unconscious and covered her with the blanket in the car her body was found in by law enforcement. [reference to evidentiary hearing transcript]. Trial counsel had moved to suppress the statement and the prosecutor had stipulated early in the trial that he would not present the statement in the State's case-in-chief. [reference to trial transcript]. The statement had not been suppressed, however, and the Defendant in his own testimony admitted that he was properly advised of his rights prior to the statement. [reference to evidentiary hearing transcript]. Trial counsel also testified that he personally believed that the Defendant's nails as depicted in the photograph were capable of causing the victim's injuries and that he made a tactical decision not to make this unwarranted argument. [reference to evidentiary hearing transcript].

Trial counsel's tactical decision not to make the complained-of "short nails" argument was a reasonable trial strategy as the photographs of the Defendant's hands clearly demonstrate that he had fingernails. Tactical decisions are not subject to postconviction attack unless they are patently unreasonable. The Court also finds that it was likely that the Defendant's statement to law enforcement could have been introduced to rebut this argument and that the trial counsel's strategy was also reasonable in this light.

(Ex. OO at 1536–37).

Petitioner raised this issue in his initial brief on appeal of the circuit court's denial of postconviction relief. (Ex. QQ). The First DCA affirmed the lower court's decision without written opinion. (Ex. SS).

Petitioner now argues that the record of the pretrial suppression hearing refutes the state court's factual findings that his statement to police was not suppressed and

that petitioner was advised of his rights prior to making the statement.  (Doc. 33 at

13).  Petitioner further argues that he never told law enforcement he seized the victim

by the throat.  (*Id.* at 14).

It is petitioner, not the state court, who misstates the record.  At the hearing on

defense counsel's motion to suppress, the parties discussed two different statements,

petitioner's statements to Deputy Tanner and Deputy Fannin at the trailer when they

arrested him (the subject of Ground One *supra*) and petitioner's recorded statement

to Investigator Steve Sunday and Investigator James Lorenz (the statement relevant

to the instant claim) at the Walton County Sheriff's Office after petitioner's arrest.

(Ex. G at 131-35).  As to petitioner's recorded statement to Investigators Sunday and

Lorenz, (*see* Ex. JJ at 763-853), the prosecutor agreed during the suppression hearing

that he would not adduce evidence of that statement in his case in chief, but stated he

may use it in rebuttal, and the suppression issue regarding the recorded statement

could be addressed at that time.  (Ex. G at 132-33, Ex. H at 237-38).  The suppression

issue regarding the recorded statement was never revisited.[4]  The record thus refutes

petitioner's assertion that the trial court suppressed his recorded statement to

Investigators Sunday and Lorenz.

Petitioner also fails to rebut the state court's factual finding that he was advised

of his *Miranda* rights prior to the recorded statement to Sunday and Lorenz.

Petitioner relies upon the suppression hearing to support his contention that law

enforcement officers admitted he was not advised of his *Miranda* rights.  (Doc. 33 at

13).  The record of the suppression hearing, however, shows that Deputy Tanner

---

[4] As discussed *supra* in Ground One, the suppression issue regarding petitioner's statements
to Deputy Tanner and Deputy Fannin at the trailer when they arrested him was addressed and
resolved later, during trial. (Ex. H at 225-37).

testified only with regard to petitioner's <u>unrecorded</u> statements to him (Tanner) at the trailer. (*See* Ex. H at 225-34). Tanner did not testify with regard to whether petitioner was advised of his *Miranda* rights prior to the recorded statement provided to Investigators Sunday and Lorenz at the Sheriff's Office. Additionally, as the state court found, petitioner admitted at the postconviction evidentiary hearing that he was advised of his rights prior to giving the recorded statement, and that he voluntarily spoke to the investigators. (Ex. LL at 1141). The transcript of the recorded statement contains petitioner's acknowledgment that he was previously advised of his rights, he understood them, and he freely and voluntarily provided the interview to Investigators Sunday and Lorenz. (Ex. JJ at 763, 851-53). Petitioner has not rebutted the state court's factual finding that he was advised of his *Miranda* rights prior to the interrogation at the Sheriff's Office by Investigators Sunday and Lorenz.

In petitioner's recorded statement to Investigators Sunday and Lorenz, petitioner admitted that during the evening prior to his wife's death, he and his wife were arguing and he slapped her in an effort to push her off him after she had slapped him, hit and kicked his knees, and stomped his toe. (Ex. JJ at 784-86, 789, 794, 797, 798, 823). Petitioner also admitted he "held her by her throat and shoulders . . . to try to keep her off of me" and shoved her with his open palm. (*Id.* at 796). Investigator Lorenz asked petitioner whether he put any pressure on his wife's throat when he grabbed it, and petitioner responded, "To keep her off of me? Yeah, I'm sure I did. I mean, it's a natural reaction." (*Id.* at 797, 808, 811-13, 815). Petitioner stated he used his left hand to grab her throat for "a minute or two" and then shoved her with his right hand. (*Id.* at 797-99, 815, 824-27). Petitioner told the investigators that after this physical exchange, he went into the trailer and left his wife outside near her

car. (*Id.* at 784-86). Petitioner stated that he later went out to the car and saw his wife lying on her right side in the back seat facing the back with her legs "all cramped up". (*Id.* at 791-92, 830-34). Petitioner stated he "skidded her over," tied her hands behind her back with a belt, and covered her with a blanket. (*Id.* at 792, 830-36). At that point, petitioner saw blood on his wife's lip and on a pillowcase. (*Id.* at 786, 792, 832–33). He stated he thought she was breathing and just "passed out" (*id.* at 792).

At the postconviction evidentiary hearing, petitioner's trial counsel, Mr. Petersen, testified he did not argue to the jury that petitioner's fingernails, as depicted in the photographs of his hands, could not have left marks on the victim's neck, because he believed it was a "bogus" argument, and petitioner's fingernails could have caused the marks. (Ex. LL at 1050-51, 1092-93). Mr. Petersen also testified that he knew if he made an issue of whether petitioner's fingernails could have left the marks, the prosecutor could have introduced petitioner's recorded statement into evidence, in which petitioner admitted grabbing the victim by the throat for one or two minutes during a physical argument, and then tying her up and leaving her lying in the backseat of her car, where the officers found her dead. (*Id.* at 1093-94, 1097).

Mr. Petersen's decision not to attempt to present evidence or argument suggesting that petitioner's fingernails were incapable of causing the marks on the victim's neck was reasonable, especially because any attempt to do so would have opened the door to the State's presenting petitioner's damaging recorded statement in rebuttal. The state court's rejection of petitioner's claim was not contrary to *Strickland*, was not an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

Ground Five: "Whether Petitioner's rights to effective assistance of counsel, as guaranteed by the Fifth (5th), Sixth (6th), and Fourteenth (14th) Amendments of the United States Constitution, were violated and/or deprived . . . when counsel failed to call F.D.L.E. crime scene investigator Janice Johnson."

Petitioner claims his trial counsel was ineffective for failing to call Janice Johnson, a crime scene investigator with the Florida Department of Law Enforcement ("FDLE"), as a witness to testify that when she visited the victim's residence/trailer on the day of the crime, March 26, 1999, and again on April 2, 1999, the residence was locked and secured, and she observed no signs of any struggle having occurred. (Doc. 1 at 16-18; Doc. 2 at 15-17; Doc. 33 at 14-16). Petitioner states that Ms. Johnson photographed the trailer and that her photographs show nothing was out of place, knocked over, or broken. (*Id.*). Petitioner contends Johnson's testimony would have refuted the State's theory that petitioner killed his wife in the trailer, because Dr. Berkland testified that the injuries on the victim's body indicated she was involved in a struggle. (*Id.*). Petitioner states Dr. Berkland also testified that if the victim had been strangled while on the sofa in the trailer, there would have been evidence such as urine, pieces of her broken necklace, her attacker's hair, saliva, fibers, and so on; however there was no evidence of this. (*Id.*). Petitioner additionally contends Ms. Johnson's testimony would have cast doubt on Cliff Yawn's testimony that he saw the victim lying on the sofa with her hands behind her back. (*Id.*).

Respondent contends the state court reasonably determined the facts and neither contradicted nor misapplied *Strickland* in denying relief on this claim. (Doc. 20 at 18). Respondent argues the state court found as fact that defense counsel made a tactical decision not to call Ms. Johnson as a witness so that he could argue there

was no evidence of a crime scene investigation as one would expect in a murder case, and this decision was reasonable (*id.*).

Petitioner raised this claim as Ground #5 in his Rule 3.850 motion. (Ex. II at 631–34). The state circuit court adjudicated the claim as follows:

> The Defendant complains in Ground V that his trial counsel was ineffective for failing to call FDLE Crime Scene Analyst Janice Johnson to testify as a defense witness that her examination of the victim's house trailer did not disclose any obvious signs of a physical struggle. Trial counsel testified that he made the reasonable tactical decision not to call Ms. Johnson to testify on this point, but, rather, in light of the prosecutor not calling a crime scene analyst, to argue that there was no evidence of a crime scene investigation as would be expected in a first degree murder investigation and trial. [reference to evidentiary hearing transcript]. Trial counsel's tactical decision was further supported by his belief that the opinions of the medical examiner Dr. Berkland would explain the lack of broken furniture or signs of a struggle and, also, blood evidence of the victim on her couch would be revealed by Ms. Johnson's testimony. Trial counsel's strategy not to call Ms. Johnson was reasonable.

(Ex. OO at 1538).

Petitioner raised this issue in his initial brief on appeal of the circuit court's denial of postconviction relief. (Ex. QQ). The First DCA affirmed the lower court's decision without written opinion. (Ex. SS).

Janice Johnson's prospective testimony is evidenced by her deposition, which is part of the record. (Ex. KK at 890-95). Johnson stated in her deposition that she visually examined Mrs. Davis's trailer on April 2, 1999, took photographs and collected evidence. (*Id.*). Johnson collected a white towel from the bathroom shower rod, a floral sheet from the master bedroom bed, and cuttings from the sofa. (*Id.*). Johnson testified that each of these items indicated the possible presence of blood on

them, but she did not know whose blood. (*Id.*). Johnson testified that the blood on each item was a "nondescript contact stain," and she observed no blood stain patterns in the trailer. (*Id.*). The blood stains on the sofa were very low, consistent with floor level. (*Id.*).

At the postconviction evidentiary hearing, petitioner's trial counsel Mr. Petersen testified that he decided not to call Janice Johnson as a witness for two reasons. First, evidence that there was nothing broken and no furniture out of place would have been consistent with the State's theory that the victim was lying on the couch when she was beaten, strangled, and tied up; therefore, Ms. Johnson's testimony would have been of little value. (Ex. LL at 1051-55, 1098-99, 1100). Second, Mr. Peterson wanted to emphasize to the jury that the theory that Mrs. Davis' trailer was the scene of the murder was inconsistent with the fact the senior FDLE crime lab analyst, Laura Rousseau, did not even go to the trailer. (*Id.*). Therefore, Petersen believed that Ms. Rousseau was a more helpful witness than Ms. Johnson. (*Id.*). Mr. Petersen additionally testified that Ms. Johnson's testimony that she collected evidence of blood near the sofa would not have been helpful to petitioner. (*Id.*).

Mr. Petersen's strategy was reasonable. On cross-examination of Dr. Berkland at trial, Mr. Petersen elicited testimony suggesting that if the trailer was the scene of the murder, there would likely have been evidence there:

> Q. . . . there should be evidence at the crime scene of whoever strangled Ms. Davis.
>
> A. . . . there oftentimes is an exchange. The exchange may be extremely slight. It may be as little as a single hair that fell off of somebody's cap or something, or it may be a fiber transfer, or it may be

the fact of just the footprints on the linoleum floor from the sole marks. It could be any number of things. But, once again, that represents an exchange. That footprint wasn't there until the person put it there and that person may have been germane to the scene initially at the time of the murder or it may have been imparted by somebody else after the fact, first responders, paramedics, EMT, fire, rescue, any number of people. So that's why we're always very cognizant of that ability of transferring evidence.

Q. Speaking of transferring, is this the belt that was found on the body?

A. Yes, it is.

Q. What's that belt appear [sic] to be made out of?

A. It's a weave fabric.

Q. So it has fibers?

A. Yes.

Q. And fibers could come off this belt on to other areas?

A. It's possible.

Q. It's possible that if JoAnn Davis was tied with her hands behind her back – and they were behind her back; is that correct?

A. That's correct.

Q. And if JoAnn Davis was laying [sic] on a couch, a fibrous couch, that fibers could exchange from the belt to the couch or the couch to the belt?

A. That's correct.

Q.  Was there any possibility of Ms. Davis bleeding during the course of her attack?

A.  She had a couple of other injuries that weren't depicted in the form of bruises in mucosal, or inner lip abrasions to the left side of her mouth.  Certainly those had the ability to bleed.  The nose injury itself had the ability to certainly bleed.  So there could have been some blood loss from those injuries.

Q.  And that blood could have been lost during the attack or afterwards.

A.  That's correct.

Q.  And once a person dies, if there's a bleeding, it continues to bleed for a while.  Is that true, or not true?

A.  Once again, if it's in an area of dependency, then certainly it can go ahead and continue to drain blood.  If it's not in an area of dependency, then it may not bleed.  So in other words, let's just take the nose example, say there was a bleeding nose back in the back but the person is positioned on their back such that blood at the time of death is draining backwards.  It may all just go down and trickle down the back of the throat and may not ever come out of the external nares because the direction of blood is going towards gravity, not against gravity.

Q.  Okay.  And there could have been a saliva transfer from the body to the couch, or wherever the crime scene was; is that true?

A.  That's correct.

Q.  And there could have been hair both from Mrs. Davis and from her attacker.

A.  That's correct.

Q. Did you look at the blanket? I believe we saw a picture yesterday of a blanket that was covering the body in the car.

A. Yes, the afghan, multi-colored afghan. Yes, sir.

Q. And the afghan is a fibrous piece of material.

A. Yes.

Q. What did you do with that afghan?

A. I believe the afghan was actually collected at the scene by the Florida Department of Law Enforcement out of Tallahassee.

Q. Was there any urine stains [sic] on Mrs. Davis?

. . . .

A. . . . the blue jeans did appear to have some urine staining.

Q. Is that something that could have been left at the scene, urine stain?

A. There could have been urine stain, sure.

Q. Did you find anything entangled in Mrs. Davis' hair?

A. A necklace.

Q. And what was the condition of the necklace?

A. I believe it was busted.

Q. Could part of that necklace have been left at the scene?

A. It's possible.

. . . .

Q. And isn't it true that the scalp is notorious for bleeding? It
bleeds profusely if there's an injury there?

A. There was no external marking of injury, but there was what
we call deep scalp hemorrhages which are down underneath the skin.
So if the skin isn't busted or lacerated that blood does not have the
ability to leak out anywhere. But yes, there was [sic] injuries to her
scalp but there was no external injury that would have bled.

(Ex. H at 394-99).

Mr. Petersen called Laura Rousseau as a witness. She testified she was a senior
crime analyst with FDLE in the Pensacola Crime Laboratory. (Ex. H at 327-28).
Rousseau testified that FDLE crime scene analysts go to the crime scene, take
photographs, look for evidence, including, hair, fibers and blood, and collect it and
turn it into the laboratory for analysis. (*Id.* at 328). Rousseau was involved in the
murder investigation, but she did not go to the location of the body in the backseat
of the vehicle. (*Id.*). Rousseau also never went to the scene of Mrs. Davis's trailer
and never inspected the couch taken from the scene to determine if there was blood
on it, or whether it was involved in a crime scene. (*Id.* at 329). Mr. Petersen
questioned Ms. Rousseau about the absence of evidence of a struggle at the trailer:

Q. If a person was strangled, and that's the State's position, an
aggressive strangle and beating, would there be evidence of that left at
a crime scene?

A. It's according to if the victim was able to, you know, fight
back or something. They might have been knocked out. I don't really
know.

Q. What type of evidence may be expected to be found at a brutal
strangulation/beating crime scene?

A.  You would probably expect to find broken items around, furniture moved out of place.  It's just according to how much opportunity—

Q. How about hair fibers, could you find hair fibers?

A. You could.

Q. How about fingernails, broken fingernails?

A. That has been found.

Q. How about the blood of the attacker?

A. It's according to if he was wounded, he or she.

. . . .

Q. Is it normal or customary for you to inspect crime scenes for those various things that we just talked about?

A.  Yes, sir.

(Ex. G at 341-42).  Ms. Rousseau testified she was present during the autopsy of the victim's body and was unable to obtain any "developable" fingerprints from the body. (Ex. H at 332).  Rousseau sent the belt to a laboratory for examination for fiber evidence and fingerprints.  (*Id.* at 330).

Through cross-examining Dr. Berkland and calling Ms. Rousseau as a witness, Mr. Petersen was able to suggest to the jury that the State's theory that Mrs. Davis' trailer was the scene of her murder was inconsistent with the fact that the senior FDLE crime lab analyst did not even bother to investigate the trailer.  Indeed, Mr. Petersen made the absence of physical crime scene evidence a feature of his closing argument, even without Johnson's testimony.  (Ex. I at 443-48).  Further, although Dr. Berkland testified that the victim's injuries indicated she struggled during the

strangulation, his testimony did not suggest the struggle was of such a degree that items in the trailer would have been out of place, knocked over, or broken; thus, Johnson's testimony would not have cast doubt on Berkland's testimony. Indeed, Dr. Berkland stated in his deposition that he observed no evidence that the victim struck blows with either of her hands. (Ex. FF at 51). Berkland stated he observed "a little bit of an injury" to one fingernail, but it may have been a "remote" injury, because it was dirty. (*Id.*). Moreover, by not calling Janice Johnson as a witness, Mr. Petersen kept out evidence that blood was discovered near the sofa. This was reasonable trial strategy. The state court's rejection of petitioner's claim was not contrary to *Strickland*, was not an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

Ground Six: "Whether Petitioner's rights to effective assistance of counsel, as guaranteed by the Fifth (5th), Sixth (6th), and Fourteenth (14th) Amendments of the United States Constitution, were violated and/or deprived . . . when counsel failed to impeach State witness Christopher John Penik."

Petitioner contends his trial counsel was ineffective for failing to impeach Christopher Penik with three inconsistent statements Penik gave during his pre-trial deposition. (Doc. 1 at 18-21; Doc. 2 at 17-18; Doc. 33 at 16-17). First, petitioner asserts that during trial Mr. Penik testified he did not know which of two trailers Mrs. Davis went into when he took her to her trailer to retrieve her spare car key, but during Penik's deposition he stated he saw Mrs. Davis go into "the second trailer on the right." (*Id.*). Second, Mr. Penik testified at trial that Mr. Yawn came to Penik's vehicle from between the two trailers and then petitioner came out from between the two trailers, but during his deposition Penik stated that both Yawn (who he referred to as "the truck driver guy") and petitioner (who Penik referred to as the "irritated"

man) came out of the second trailer on the right, and Yawn went back into the trailer but petitioner did not. (*Id.*). Third, Mr. Penik testified at trial that petitioner gave Yawn the extra car key, but during his deposition Penik stated that Yawn retrieved the extra car key from inside the trailer. (*Id.*). Petitioner argues that had counsel impeached Mr. Penik's testimony with these prior inconsistent statements, it would have supported the defense theory that Mr. Yawn was involved in the murder by establishing that Yawn was the last person seen with Mrs. Davis, and by casting doubt on Yawn's credibility. (*Id.*).

Respondent argues that the state court reasonably determined the facts and neither contradicted nor misapplied *Strickland* in denying relief on this claim. (Doc. 20 at 18). Respondent argues defense counsel's strategy of not calling Mr. Penik as a witness to avoid impeachment of the "defense time-line witness" was reasonable. (*Id.* at 18-19).

Petitioner raised this claim as Ground #6 in his Rule 3.850 motion. (Ex. II at 635-39). The state circuit court adjudicated the claim as follows:

> The State conceded that Mr. Penik's deposition testimony was somewhat inconsistent with his trial testimony; thus, the State initially submitted that regardless of trial counsel's reasons not to impeach Mr. Penik, his failure to do so does not rise to the level of prejudice required by *Strickland v. Washington, supra*. The Court agrees.
>
> Trial counsel testified that he made a reasonable tactical decision not to attack Mr. Penik's credibility as his theory of defense depended on the jury accepting Penik's testimony that James Clifton Yawn had not called law enforcement for fifty-two (52) minutes after he returned to the victim's house trailer – contrary to Yawn's testimony that he immediately called law enforcement. Trial counsel also testified that regardless of whether Mr. Penik testified that Mr. Yawn was the last person to enter the victim's trailer, the evidence was uncontradicted that

the Defendant was left alone with the victim in her trailer when Mr. Yawn and Penik left to attempt to retrieve the victim's automobile. Trial counsel also testified that he was aware of Mr. Penik's taped statement to law enforcement given immediately after the murder [reference to transcript of Christopher John Penik's statement to Investigator Steve Sunday] and that it was consistent with Mr. Penik's trial testimony and could be used by the prosecutor as a prior consistent statement to rebut any impeachment by the deposition. Penik was the defense time-line witness and trial counsel did not want to adversely impact his credibility. [reference to evidentiary hearing transcript]. Accordingly, Ground VI is hereby denied on the merits.

(Ex. OO at 1538-39).

Petitioner raised this issue in his initial brief on appeal of the circuit court's denial of postconviction relief. (Ex. QQ). The First DCA affirmed the lower court's decision without written opinion. (Ex. SS).

The record includes a transcript of Mr. Penik's statement to Investigator Steve Sunday on March 26, or 27, 1999, a transcript of Mr. Penik's deposition on November 30, 1999, and the transcript of Penik's testimony at trial. (Ex. KK at 854-68, Ex. C at 475-90, Ex. H at 201-13). Mr. Penik's trial testimony, that Mrs. Davis walked between the two trailers, and he did not see which one she entered (ex. H at 204), was inconsistent with his deposition testimony that she entered the second trailer on the right. (Ex. C at 481, 485). Penik's trial testimony was consistent, however, with Penik's statement to Investigator Sunday, which the prosecutor could have used to rehabilitate Mr. Penik. (Ex. KK at 862). Because the prosecutor could have rehabilitated Mr. Penik with Penik's prior consistent statement, Mr. Petersen's failure to impeach Penik on this point was not unreasonable or prejudicial.

Likewise, although Mr. Penik's trial testimony that Mr. Yawn came to Penik's vehicle from between the two trailers and then petitioner came out from between the

two trailers (ex. H at 206–07), was inconsistent with Penik's deposition testimony that Yawn and petitioner came out of the second trailer on the right (ex. C at 485–87), Penik's trial testimony was consistent with his statement to Investigator Sunday that the men emerged from between the two trailers. (Ex. KK at 862-63, 867). Again, Mr. Petersen's failure to impeach Penik on this point was not unreasonable or prejudicial, because the prosecutor could have rehabilitated Penik with Penik's prior consistent statement.

Additionally, there was no inconsistency in Mr. Penik's trial testimony that petitioner gave Yawn the extra car key. (Ex. H at 210). During Penik's deposition, Penik stated both that Yawn retrieved the key from inside the trailer, and that petitioner handed the key to Yawn. (Ex. C at 483, 485). In Penik's statement to Investigator Sunday, Penik stated that petitioner had the key in his hand and gave it to Yawn. (Ex. KK at 864). Mr. Penik's prior statements concerning how Yawn came into possession of the extra car key did not provide a basis to impeach Penik's trial testimony.

The only trial testimony of Mr. Penik that Mr. Petersen had a reasonable basis to impeach was Penik's testimony that petitioner and Yawn went back to the trailer. (Ex. H at 208, 210). This testimony was inconsistent with Penik's deposition testimony that Yawn went back into the trailer but petitioner did not. (Ex. C at 485-–86). At the postconviction evidentiary hearing, Mr. Petersen explained his reasons for not impeaching Mr. Penik's testimony. (Ex. LL at 1066-69, 1101-06). Petersen stated that he realized Mr. Penik's statements were different, but Penik was the only witness who did not have a grudge or reason to lie, and he wanted the jury to accept Mr. Penik's testimony as accurate because Penik assisted the defense in establishing

a time frame which showed that Mr. Yawn proclaimed to be very concerned about Mrs. Davis' safety yet delayed nearly an hour in calling police after he returned to the trailer with Mrs. Davis' car. (*Id.*). Mr. Petersen additionally stated it would not have made sense to elicit testimony that Yawn had an opportunity to kill Mrs. Davis when he went back into the trailer to get the extra key, because that would have placed petitioner in the trailer with the dead Mrs. Davis without calling police, while Penik and Yawn retrieved her car. (*Id.*). Mr. Petersen's reasons for not impeaching Mr. Penik on the issue of whether petitioner or Mr. Yawn went back inside the trailer before Penik and Yawn left to retrieve Mrs. Davis' car were sound. The state court's rejection of petitioner's claim was not contrary to *Strickland*, was not an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

Ground Seven: "Whether the defendant was deprived effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, by counsel's failure to investigate and file a motion to suppress the statements of State witness Chad Rushing."

Ground Eight: "Whether the defendant's right to effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, was deprived when counsel failed to impeach State witness Chad Rushing."

Petitioner asserts that prior to trial, his trial counsel Mr. Petersen advised him that a jail inmate named Chad Rushing wrote to the prosecutor's office informing them that while eating in the chow hall of the jail with petitioner a few days after petitioner's arrest, petitioner allegedly told Rushing he killed his wife. (Doc. 1 at 21-26; Doc. 2 at 18-21). Petitioner asserts he told Mr. Petersen that the statements were untrue and that it would have been impossible for petitioner to have made the

statements to Rushing because petitioner was housed in cell 211 and inmates in that cell are not permitted to dine in the cafeteria. (*id.*). Petitioner asserts that he asked Mr. Petersen to contact officials at the jail to verify he was housed in cell 211 at the time and was not allowed to eat in the chow hall, and that he gave counsel the names of twelve individuals who could testify to those facts, Captain Adkinson, Lt. Roy Sylvester, Sgt. James Hall, Sgt. Price, Corporal Ferrier, Corporal Bird, Officer Gandy, Officer Michael Johnson, Officer Parker, Officer C. Johnson, Nurse E. Frick, and Nurse Debbie McCormick. (*Id.*). Petitioner contends if counsel had investigated this issue and either sought suppression of Mr. Rushing's statement on the ground that it was fabricated or called witnesses to impeach Rushing's testimony, the result of his trial would have been different. (*Id.*).

Respondent contends petitioner expressly withdrew the suppression part of his argument at the evidentiary hearing; therefore, that aspect of his claim is unexhausted and procedurally barred from federal review. (Ex. 20 at 19-20). As to the remaining aspects of petitioner's claim, that is, counsel's failure to investigate Mr. Rushing's testimony and present testimony from jail personnel to impeach Rushing's testimony, respondent contends the state court reasonably determined the facts and neither contradicted nor misapplied *Strickland* in denying relief on this claim. (*Id.*). Respondent argues the state court found as fact that defense counsel made a strategic decision to impeach Mr. Rushing based on his desire for leniency from state and federal criminal courts, rather than rely on thin evidence that Rushing and Davis may not have had an opportunity to talk in the chow hall. (*Id.*).

Petitioner's reply (doc. 33), abandons the suppression argument and argues only ineffective assistance of counsel based upon counsel's failure to investigate and call witnesses to impeach Rushing's testimony. (*Id.* at 17-19).

Petitioner raised all aspects of Grounds Seven and Eight in Grounds #7 and #8 of his Rule 3.850 motion. (Ex. II at 639-45). At the postconviction evidentiary hearing, petitioner's counsel conceded, "There's really no basis for suppressing testimony because you think it's impeachable." (Ex. LL at 985-86). Additionally, petitioner consolidated Grounds # 7 and 8. (*Id.* at 986). In the state circuit court's order denying the Rule 3.850 motion, the court noted:

> The Defendant's claims in Grounds VII and VIII are essentially identical. Defendant claims that trial counsel was ineffective by failing to: (1) investigate the veracity of the testimony of state witness Chad Rushing that he heard (in the jail chow hall) the Defendant's admission that he murdered his wife; (2) file a motion to suppress Rushing's testimony; and (3) call jail personnel to impeach Rushing's testimony. The Defendant's postconviction counsel appears to have conceded that no motion to suppress was appropriate and that the Court should find so as no legal reasons have been raised to support a motion to suppress or a motion in limine. [reference to evidentiary hearing transcript]. The issues then before the Court are whether trial counsel failed to investigate this issue and whether it was ineffective assistance to not call jail personnel to impeach Rushing.

(Ex. OO at 1539).

In petitioner's *pro se* initial brief on appeal of the circuit court's decision denying his Rule 3.850 motion, petitioner argued only that counsel was ineffective for failing to investigate and impeach Mr. Rushing; he did not argue counsel was ineffective for failing to seek suppression of Rushing's testimony. (Ex. QQ at 3, 17-21, 39-41). It is well established in Florida courts that claims for which an appellant

has not presented any argument, or for which he provides only conclusory argument, are insufficiently presented for review and are waived. *See Gamble v. State*, 877 So. 2d 706 (Fla. 2004); *Reed v. State*, 875 So. 2d 415 (Fla. 2004); *Marshall v. State*, 854 So. 2d 1235, 1252 (Fla. 2003) *Sweet v. State*, 810 So. 2d 854, 870 (Fla. 2002); *Johnson v. State*, 769 So. 2d 990, 1005-06 (Fla. 2000); *Duest v. Dugger*, 555 So. 2d 849, 852 (Fla. 1990). This is a firmly established and regularly followed procedural rule for purposes of federal habeas. Petitioner did not properly present the suppression aspect of Grounds Seven and Eight to the state courts for review. Any attempt to return to state court to present the issue would be futile, because a second postconviction appeal is not available, and a second Rule 3.850 motion would be subject to dismissal as successive. *See* Fla. R. Crim. P. 3.850(f). Petitioner's argument that defense counsel was ineffective for failing to seek suppression of Mr. Rushing's testimony is procedurally defaulted from federal habeas review. The Court will review only petitioner's claims that defense counsel was ineffective for failing to investigate and impeach Mr. Rushing's testimony.

The state circuit court adjudicated petitioner's claim as follows:

> The Defendant's testimony is that prior to trial he informed trial counsel that as a cell 211 inmate he was not able to have been eating in the chow hall as Rushing claimed and of [sic] jail personnel who could testify to the jail feeding policy. The Defendant claimed that trial counsel never discussed any investigation of this issue with him prior to trial and to his knowledge first inquired about the issue to Corrections Officer Mark Bird during the trial. [reference to evidentiary hearing transcript].

> Trial counsel testified that he did investigate the jail feeding policy by questioning a couple of jail officers and both informed him that the normal policy was to feed cell 211 inmates such as the

Defendant in their cell and not in the chow hall, but both informed him that they would not and could not testify that the Defendant was never in the chow hall with Rushing. Trial counsel further testified, and the trial transcript reflects, that he chose as a matter of trial strategy not to call the jail personnel and to focus his attack on Rushing primarily on Rushing's hope and desire to obtain leniency from the state and federal courts and prosecutors in return for his testimony. [reference to trial transcript]. Trial counsel rigorously cross-examined Rushing, pointing out his criminal history, his desire for leniency, and that he waited over a year to tell of Davis's admission. [reference to trial transcript]. Trial counsel also testified that contrary to the Defendant's claim and testimony, he fully discussed this issue with the Defendant, informed the Defendant of his strategy concerning Rushing's impeachment and that the Defendant agreed with his strategy. [reference to evidentiary hearing transcript].

Matters of reasonable trial strategy are not cognizable in post-conviction relief. Furthermore, the Defendant cannot satisfy the *Strickland* prejudice prong. The circumstances of the case would have still overwhelmingly suggested that the Defendant murdered the victim as her body was found tied up and covered in her car outside the Defendant's residence by law enforcement officers who then apprehended the Defendant hiding behind furniture in the residence and the keys to the car on a table therein. Three witnesses (Brandon Wood, David Blair, and Herman Patrick Morton) testified to the Defendant's statements of intent to kill his wife, the victim. There is no likelihood that this minor point of impeachment of Chad Rushing would have created a different trial result.

(Ex. OO at 1540-41).

As previously discussed, petitioner raised the issues of trial counsel's failure to investigate and impeach Mr. Rushing's testimony in his initial brief on appeal of the circuit court's denial of his Rule 3.850 motion. (Ex. QQ). The First DCA affirmed the lower court's decision without written opinion. (Ex. SS).

Although the circuit court inadvertently used the word "likelihood" in concluding petitioner failed to satisfy the prejudice prong of the *Strickland* standard, the court stated the correct "reasonable probability" standard in its discussion of the legal standard applicable to petitioner's claims. (Ex. OO at 1532-33). *See also Berghuis v. Thompkins*, — U.S. —, 130 S. Ct. 2250, 2265, 176 L. Ed. 2d 1098 (2010) (using the term "not reasonably likely" in discussing habeas petitioner's failure to establish prejudice under *Strickland*). Further, petitioner has not shown that the First DCA applied a legal rule other than the *Strickland* standard in reviewing petitioner's claims, nor is there any indication in the record that the appellate court applied a rule contrary to *Strickland*.

Captain Glen Adkinson, Officer Michael Johnson and Officer Cameron Johnson testified at the postconviction evidentiary hearing. (Ex. LL at 1000-1, 1017-–27). Captain Adkinson testified he was the jail administrator during the period 1999 - 2001. (*Id.*). Cell 211 was a maximum security cell. (*Id.*). Adkinson testified taht the inmates housed in that cell were always fed in the cell, but Adkinson subsequently qualified this statement:

> Q [by petitioner's post-conviction counsel]. Would they [inmates in cell 211] ever be taken to the chow hall for feeding purposes?
>
> A. The one thing that I can say is you don't never [sic] say never. But now, I don't recall them being carried to the chow hall.
>
> Q. Is it fair to say you don't rule out Murphy's Law; what can go wrong will go wrong?
>
> A. Right. We was [sic] always shorthanded and you did what you had to do at the time.

Q. While in the sense of anything's possible, the policy was they had to be kept in 211 and fed in 211?

A. Yes, sir.

Q. And assuming everybody did their job, that's what happened?

A. Right.

(Ex. LL at 1004-05). On cross-examination, Captain Adkinson testified that when he was not on duty, the person in charge, either a lieutenant or sergeant, had discretion with regard to activities at the jail. (*Id.* at 1007-08). Adkinson testified that on occasion, discretion was exercised regarding the inmates in cell 211, for example, an officer may allow an inmate in cell 211 out of the cell. (*Id.* at 1008). Captain Adkinson testified that people have asked him about the feeding procedure for inmates in 211, but he did not recall who in particular asked him. (*Id.* at 1008-09). Adkinson testified that Mr. Petersen, petitioner's trial counsel, may have asked him about it. (*Id.* at 1009). Adkinson testified further:

Q[by the State]. . . . as you said earlier, you could never say never. And what you meant by that is you can't testify today that Inmate Chad Rushing never met with Inmate Peter Davis in the chow hall, even though Peter Davis was a maximum security inmate?

A. No, sir, I couldn't.

Q. And if Mr. Petersen . . . had asked you about that back before the trial of this case, which happened five years ago, if they had asked you about that, that's what you would have told them then?

A. It would have been the same thing.

Q. That you couldn't ever say that it couldn't happen?

A.  Right.

(*Id.* at 1010).  Captain Adkinson testified that the only testimony he could have provided at petitioner's trial was that if the jail policy had been followed, Chad Rushing would never have met an inmate from cell 211 in the chow hall.  (*Id.*).

Officer Michael Johnson testified that he worked at the jail since 1998.  (Ex. LL at 1017-18).  Johnson could not recall whether inmates in cell 211 were sent to the chow hall or fed in the cell, but "thought" food trays were brought to them in the cell.  (*Id.* at 1018-19).

Officer Cameron Johnson testified he was employed at the jail from March of 1999 through April of 2001.  (Ex. LL at 1021-22).  The jail policy at that time was that inmates in cell 211 were always fed in the cell.  (*Id.* at 1023, 1026).

Mr. Petersen, petitioner's trial counsel, testified at the evidentiary hearing that after Chad Rushing's deposition and before trial, he discussed Rushing's prospective testimony with petitioner.  (Ex. LL at 1032).  Petersen testified that petitioner told him he could not have had a conversation with Rushing, because he was in cell 211 and Rushing was in another cell.  (*Id.*).  Mr. Petersen testified that petitioner asked him to check with jail personnel, because inmates in cell 211 usually did not mingle or eat with inmates in other parts of the jail.  (*Id.*).  Mr. Petersen spoke with one or two jail personnel about the issue, but did not recall their names.  (*Id.*).  Petersen testified that the jail personnel told him Mr. Rushing and petitioner could have been eating in the chow hall at the same time, although it was not the normal procedure.  (*Id.* at 1033, 1086).  The two deputies with whom Petersen spoke stated they could <u>not</u> testify that the inmates in cell 211 and Chad Rushing's cell could not have been together in the chow hall, because it was possible they could have been together in

the chow hall. (*Id.*). Mr. Petersen testified he did not believe it necessary or advantageous to bring out that testimony. (*Id.* at 1033). According to Petersen, he (Petersen) advised petitioner of this information and that he did not believe it was necessary to call jail personnel as witnesses, and petitioner agreed with the decision. (*Id.* at 1033, 1085, 1088). Mr. Petersen testified he made a strategic decision to attack Mr. Rushing's credibility on the ground that he was giving false testimony against petitioner to obtain leniency in his state and federal prosecutions. (*Id.* at 1087).

Petitioner testified at the postconviction evidentiary hearing that Mr. Petersen never advised him he had talked to deputies about whether petitioner and Rushing could have been together in the chow hall. (*Id.* at 1131-33). Petitioner further testified that he obtained copies of Mr. Petersen's billing records, and there were no notations indicating Petersen talked to or visited jail personnel. (*Id.* at 1131). Petitioner testified that during trial, he told Mr. Petersen to ask someone from the jail about the policy, and Mr. Petersen turned to Officer Mark Bird and asked whether cell 211 ate in the chow hall, and Bird responded that inmates in 211 were required to eat in the cell. (*Id.* at 1132-33). Petitioner testified that even if Mr. Petersen had told him that jail personnel would not testify that interaction with Rushing was impossible, he still would not have agreed to forgo that area of impeachment. (*Id.* at 1133).

Mr. Petersen was recalled at the evidentiary hearing and testified that his discussions with jail personnel occurred when he was visiting petitioner at the jail. (Ex. LL at 1150). Petersen testified that he "absolutely" had the discussions with jail personnel prior to trial (*id.*), and that he did not recall speaking to Mr. Bird or any other security officer during trial about the feeding policy (*id.* at 1150–52).

Mr. Petersen's billing records were part of the state court record. (Ex. F at 1008-–22). The records show that Mr. Petersen deposed Chad Rushing on April 17, 2001, and spoke with petitioner on the telephone on April 24, 2001. (*See id.*). There is no indication Mr Petersen visited the jail between April 17 and the first day of trial, April 30. (*Id.*). The record also demonstrates, however, that Chad Rushing was disclosed to the defense as a potential witness on May 19, 2000, nearly one year prior to trial. (Ex. E at 876). Mr. Petersen's billing records show that from the time his representation of petitioner commenced on November 7, 2000 (*see* Ex. LL at 1040-41), to the date of trial, Petersen visited petitioner at the jail eleven (11) times. (Ex. F at 1008-18).

Although the billing records contradict Mr. Petersen's testimony that <u>after Mr. Rushing's deposition</u> he spoke with jail personnel at the jail regarding the feeding policy, the records do not clearly and convincingly rebut the state court's factual finding that Petersen investigated the jail feeding policy by questioning jail officers, both of whom informed him that the normal policy was to feed cell 211 inmates in the cell and not in the chow hall, but also informed him that they would not and could not testify that petitioner was never in the chow hall with Rushing. Petitioner also fails to rebut the state court's factual finding that Mr. Petersen chose as a matter of trial strategy not to call the jail personnel and to focus his impeachment on Rushing's hope and desire to obtain leniency from the state and federal courts and prosecutors in return for his testimony. Likewise, petitioner fails to rebut the state court's finding that Mr. Petersen rigorously cross-examined Rushing, pointing out his criminal history, his desire for leniency, and his delay of over one year in reporting petitioner's admission. These state court findings are entitled to a presumption of correctness.

In light of the state court's factual findings, petitioner's claim that Mr. Petersen failed to investigate the jail's feeding policy was reasonably denied. Additionally, regardless of whether Mr. Petersen discussed his impeachment strategy with petitioner and regardless of whether petitioner agreed with it, the strategy was reasonable. Exposing Mr. Rushing's motive for testifying and his delay in revealing petitioner's admission was a stronger impeachment strategy than attempting to establish Rushing had no opportunity to speak with petitioner by calling witnesses who would have testified that although jail policy required them to eat separately, they could have been together in the chow hall.

The state court's rejection of the issues raised in Grounds Seven and Eight was not contrary to *Strickland*, was not an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts. Petitioner is not entitled to federal relief on either of these grounds.

Ground Nine: "Whether the defendant's right to effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, was deprived when counsel failed to investigate and call available witnesses to refute/impeach the testimony of Merman [sic] Patrick Morton."

Petitioner asserts Mr. Petersen was ineffective for failing to call Brandon Woods, Christopher David Blair, Deputy Donna Armstrong and Shirley Carroll, petitioner's ex-wife, as witnesses to impeach the testimony of Patrick Morton. (Doc. 1 at 27-30; Doc. 33 at 19-20). Petitioner states Patrick Morton testified that nine days prior to the murder, he saw petitioner driving the victim's green GM truck and getting gas at a local convenience store, and petitioner announced at the convenience store he was going to kill the victim and their child. (*Id*.). Petitioner states Mr. Woods and Mr. Blair would have testified that they transported petitioner to and from work for

two weeks prior to the murder, because petitioner did not have a vehicle. (*Id.*). Petitioner asserts his ex-wife, Ms. Carroll, would have testified that she gave petitioner a ride on numerous occasions for two weeks prior to the murder. (*Id.*). Petitioner additionally asserts Deputy Donna Armstrong testified in her deposition that the victim's green truck was not running properly, the tag was expired, and she gave petitioner a ride on February 16, 1999 (nearly six weeks prior to the murder). (*Id.*). Petitioner also states the victim had filed an affidavit in an unrelated matter on March 3, 1999 (over three weeks prior to the murder) stating she possessed the green truck, and it had no brakes. (*Id.*). Petitioner asserts counsel was aware of the potential testimony of all of these witnesses. (*Id.*). Petitioner asserts that the result of his trial would have been different had Mr. Petersen called these witnesses to impeach Mr. Morton's testimony. (*Id.*).

Respondent asserts that the state court reasonably determined the facts and neither contradicted nor misapplied *Strickland* in denying this claim. (Doc. 20 at 20). Respondent argues the state court's findings show that defense counsel made a reasonable tactical decision not to attempt "piecemeal" impeachment of Mr. Morton, over the minimal point of whether the truck was operable the day Morton said petitioner drove to a convenience store and announced he would kill his wife. (*Id.*).

Petitioner raised this claim as Ground #9 in his Rule 3.850 motion. (Ex. LL at 646-49). The state circuit court adjudicated the claim as follows:

> Witness Herman Patrick Morton testified at trial that nine days prior to the murder, the Defendant arrived at a convenience store in his truck and announced over the store's intercom that he was going to kill his wife. [reference to trial transcript]. The Defendant claims that his truck was inoperable at that time and that trial counsel was ineffective for not calling witnesses to support his claim, each of whom would

supposedly testify that they gave the Defendant rides during this time frame, [suggesting] that his truck was inoperable.

Trial counsel testified that he and the Defendant fully discussed this issue and that he fully investigated it, and could find no evidence or witness that the truck was inoperable on the date Mr. Morton claimed to have seen the Defendant in the truck at the convenience store. Trial counsel further testified that he knew that even if he impeached Morton's recollection of how the Defendant arrived at the convenience store, Morton's testimony of the admission would still be before the jury and would still be corroborated by the testimony of Brandon Woods and Christopher David Blair that the Defendant made statements of intent to kill his wife. Trial counsel testified that he made a tactical decision not to attempt this piece-meal impeachment of Mr. Morton. [reference to evidentiary hearing transcript].

Trial counsel's tactical decision was reasonable and not subject to collateral attack. Furthermore, the Defendant has not and cannot demonstrate the prejudice required by *Strickland* that a different trial result was probable in light of the overwhelming circumstantial evidence and the testimony of the Defendant's statements of intent to kill by two other witnesses, Blair and Woods.

(Ex. OO at 1541-42).

At the evidentiary hearing, Mr. Petersen acknowledged that petitioner mentioned to him that Deputy Armstrong, Ms. Carroll and Mr. Blair could testify that the victim's truck was not working at the time Mr. Morton said the incident at the convenience store occurred, and that petitioner was having to hitch rides during that time. (Ex. LL at 1071-72). Mr. Petersen testified that he talked to each of these witnesses, but the most they could offer was that the truck had a deficiency, for example, bad brakes, and was not running one day during the two to four-week period prior to when the incident at the convenience store occurred. (*Id.* at 1072-73).

Petersen testified he tried to find someone that could testify that in the relevant time frame, the truck could not have been driven, but he was unable to find that evidence. (*Id.* at 1073-80, 1108).

Included in the state court record are depositions of Deputy Armstrong and Ms. Carroll, a transcript of a recorded statement to law enforcement by Mr. Blair, and the trial testimony of Mr. Blair and Mr. Woods. (Ex. FF at 887-914, Ex. KK at 899-914, 952-71, Ex. F at 214-24). Although all of those witnesses stated they gave petitioner rides on various occasions prior to the murder, none of them stated the truck described by Mr. Morton was not operable on the date Mr. Morton testified he saw petitioner drive it to the convenience store. For example, Deputy Donna Armstrong stated in her deposition that on February 16, 1999, she was dispatched to the trailer where Mrs. Davis was staying. (Ex. FF at 7-10). Deputy Armstrong stated that a white car and a truck were at the residence. (*Id*. at 10). Deputy Armstrong stated petitioner was outside the trailer and stated he wanted to take one of the vehicles. (*Id.*). Deputy Armstrong spoke with Mrs. Davis inside the trailer, and Mrs. Davis stated the white car was operable, but the truck "didn't work very well" and also had an expired tag, so "no one needs to be driving it." (*Id.*). Mrs. Davis told Armstrong that the truck belonged to her elderly father, and no one wanted petitioner to drive it. (*Id.*). Mrs. Davis also stated she needed the white car more than petitioner needed it, and Deputy Armstrong agreed. (*Id.*). Armstrong told petitioner that the car needed to stay with Mrs. Davis, and he could not take the truck. (*Id.*). Armstrong then gave petitioner a ride to the Yawns' residence. (*Id.* at 10-12).

Shirley Carroll testified in her deposition that the Saturday before the murder, petitioner called her brother and asked if he could come to their house. (Ex. KK at

904). Ms. Carroll stated someone dropped off petitioner at their house, and she took petitioner home (to where he was staying on Bishop Road) later that night. (*Id.* at 905). Carroll picked up petitioner the next morning, on Sunday, and then took him home that evening. (*Id.* at 906). Ms. Carroll stated someone again dropped off petitioner at her house on Tuesday, and she told him she would not take him home, so he needed to call someone to come and get him. (*Id.* at 907). Someone again dropped off petitioner at her home on Wednesday, and he asked her to take him to get something to eat. (*Id.*). Ms. Carroll stated she told petitioner she did not want him to come over everyday, and he agreed. (*Id.*). Carroll took petitioner home again that night. (*Id.*). Petitioner came again the next day, the day of the murder, at approximately 4:00 p.m., and stayed for an hour. (*Id.* at 908). Carroll told petitioner he needed to call someone to pick him up, and someone in a red truck picked him up. (*Id.*).

Christopher David Blair provided a pre-trial statement to Investigators Steve Sunday and James Lorenz on March 26 or 27, 1999 (Ex. KK at 952-71). Mr. Blair stated that petitioner had been working for him for a week and a half prior to the murder. (*Id.*). Blair stated that "Jeff" picked petitioner up every morning, and he (Blair) and Jeff took petitioner home at night. (*Id.*).

At trial, both Mr. Blair and Brandon Woods testified that petitioner expressed anger toward the victim and stated that he wished to kill her. (Ex. F at 214-24). Mr. Blair additionally mentioned that he and petitioner rode to work together, and he on one occasion drove petitioner to a Mailboxes, Etc. store to fax something. (*Id.* at 220-21, 224).

Petitioner has not shown that Mr. Petersen's decision not to call Armstrong, Carroll, Blair and Woods to impeach Mr. Morton's testimony was unreasonable. The state court's rejection of petitioner's claim was not contrary to *Strickland*, was not an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining the meaning of this term) (citation omitted). Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.     That the petition for writ of habeas corpus (doc. 1), challenging the judgment of conviction and sentence in *State of Florida v. Peter Anthony Davis* in the Circuit Court for Walton County, Florida, Case No. 99-CF-0141 be DENIED, and the clerk directed to close the file.

2.     That a certificate of appealability be DENIED.

At Pensacola, Florida, this 20th day of November 2012.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).